UNITED STATES v. UNITED STATES DISTRICT COURT IN AND FOR SOUTHERN DIST. OF CALIFORNIA, NORTHERN DIVISION, et al.

No. 13891.

United States Court of Appeals
Ninth Circuit.

Aug. 4, 1953.

William H. Veeder, Sp. Asst. to Atty. Gen., Washington, D. C., for appellant.

Claude L. Rowe, Fresno, Cal., for appellees.

Before STEPHENS, ORR, and POPE, Circuit Judges.

STEPHENS, Circuit Judge.

This case originated in this court and arises from the pendency in the United States District Court for the Southern District of California, Northern Division, of the case entitled Rank v. Krug (See 90 F. Supp. 773.) The United States pursuant to leave granted filed its petition with us for the issuance of the writ of prohibition or in the alternative for a writ of mandamus, to be directed to Judge Hall, the presiding judge in the Rank v. Krug case. We granted an order to show cause why an order of Judge Hall's, made April 24, 1953, which amended a former order, should not be vacated, and we further ordered that, pending hearing on the show cause order, the order of April 24, 1953 should be vacated in part.[1]

---

1. The effective part of our order of June 29, 1953, is as follows:

"It is ordered that the Respondents show cause to this Court on July 7, 1953, why a writ of prohibition or a writ of mandamus should not issue directed to the Respondents and commanding them to refrain and desist from taking any further steps or proceedings in connection with the trial of the case of Rank, et al., v. Martin Blote and Jack W. Rodner, et al., sometimes referred to as Rank et al.

v. Krug et al., Civil No. 681-ND, 685-ND, and associated cases, in the United States District Court for the Southern District of California, Northern Division, and commanding them in connection with that case to refrain and desist from taking any action by way of or pursuant to court orders or otherwise, which affect in any way the operations by the United States of America of Friant Dam, Millerton Lake, or waters impounded or to be impounded from the San Joaquin Riv-

Thereafter, Judge Hall filed a motion to strike certain portions of Petitioner's (United States') motion for permission to file. Respondents filed a motion to dismiss the motion for permission to file the petition for the writ of prohibition etc. Respondents also filed their motion to vacate portions of our order. We granted leave to the State of California and fourteen irrigation districts and a municipal utility district to file an *amicus curiae* brief. Upon our suggestion, but not our request, the United States made an oral motion that Martin H. Blote be made a party-petitioner which motion was thereafter put in writing and filed with the clerk.

On July 10, 1953, we heard argument on all matters before our court and they were submitted for decision.

The petition of the United States that Martin H. Blote be joined as a party petitioner is denied without prejudice, because the written petition contains conditions or reservations which we decline to consider at this time.

All other motions and petitions, except the relief requested in the petition of the United States, are denied without prejudice because we do not deem them of importance at this juncture.

The case of Rank v. Krug was originally filed in the Superior Court of the State of California in and for the County of Fresno, on or about September 24, 1947, and was thereafter removed to the United States District Court and is now pending in that court. That case arose from the institution and operation of what is commonly termed "The Central Valley Project".

The great Central Valley of California extends from the Siskiyou Mountains in the north to the Tehachapi Mountains in the south and lies between the foothills of the Sierra on the east and the foothills of the Coast Range on the west. The southerly part of this valley is often called "San Joaquin Valley" and the northerly part

"Sacramento Valley". The rainfall is comparatively high in the Sierra, moderate in the Coast Range, and slight and short-seasoned in the Valley. By far, the greater part of the natural water-run-off of the easterly range of mountains, with a much smaller portion of the run-off from the westerly range, form the two rivers, the San Joaquin flowing westerly and then northerly in the San Joaquin Valley, and the Sacramento flowing southerly in the valley of that name. These rivers join near the City of Stockton and their combined waters flow westerly into the world-renowned Bay of San Francisco.

There is a surplus of water in the Sacramento Valley and a deficit of water in the San Joaquin Valley, measured economically. It was and is the purpose of the governments of the United States and of the State of California to transport surplus Sacramento River water into the watershed of the San Joaquin River for economic reasons. In accomplishing the desired ends, dams and transmission conduits have been constructed for the storage and transportation of water to the places of its use. The natural flows of streams have been altered and efforts have been made to adjust and equate the supply of water. As the San Joaquin River emerges from the Sierra easterly form the City of Fresno and cuts through the foothills, its flow is interrupted by the Friant Dam, and the accumulating water forms the "Millerton Lake". From this lake, with its accumulation of regular and flash run-offs of the river, water is equated and distributed for beneficial uses.

The Rank v. Krug suit concerns the legal right to distribution of the water impounded in Millerton Lake in relation to certain water rights of claimants below the dam, and down to "Mendota Pool", a stretch of about forty miles. The dam is the property of the United States and it, with the water back of it, is, and since the water has accumulated, has been in the possession

er in Millerton Lake or from taking any action in regard to any other properties of the United States of America;

"It is further ordered that Respondent Peirson M. Hall, as Judge of said United States District Court forthwith make and enter an order staying until further order of this Court that part of the order dated April 24, 1953, which requires a release of a minimum of 400 cubic feet per second of water from Friant Dam."

of the United States and actually controlled by the United States under its claim of right.

The plaintiffs' claim in the Rank v. Krug action, briefly stated, is that they have the present right to a flow down the San Joaquin River between the named points and that those in charge of the dam and its outlets have and are preventing a sufficient amount of water to flow into the river to adequately supply their rightful beneficial uses.

The project, the law by which it was initiated and constructed, the applicable water law of California and the issues involved in the Rank v. Krug action, may be found described and documented in Rank v. Krug, D.C.1950, 90 F.Supp. 773, in an opinion rendered by Judge Peirson M. Hall upon decision as to a motion for injunction *pendente lite*. See, also, United States v. Gerlach Live Stock Co., 1950, 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231.

Insofar as it is useful to mention here, the defendants in the pending district court case of Rank v. Krug, being sued individually and officially are: Julius A. Krug, the then Secretary of the Interior of the United States; and the following persons holding the following offices in the United States Bureau of Reclamation, viz.: Michael W. Straus, Commissioner; Richard Boke, Regional Director; Martin Blote, Regional Water Master; Jack Rodner, District Manager; R. K. Durant, Construction Engineer and Resident Engineer; also named as defendants are: Madera Irrigation District and its Directors; Southern San Joaquin Municipal Utility District and its Directors; as well as various Doe districts and Doe directors.

As is seen, the United States is not named as a party and the court throughout its entertainment of the action has conducted the case upon its holding that the United States is not a party and is not a necessary or indispensable party to the maintenance of the action. The court has, however, made the suggestion that the United States voluntarily come into the action as a party; and at the time the instant proceeding was submitted, a motion by plaintiffs to make the United States a party had been made but remained unruled upon. (See Title 43 U.S.C.A. § 666, a statute permitting the United States to be made a party to water cases, enacted however, after the institution of the Rank v. Krug suit.) An Assistant Attorney General is the attorney of record for all of the named United States officials and employees who have appeared in the case, and throughout the proceedings he has actively participated in the interests of the Project as directed by the Attorney General of the United States.

■ There is nothing new, irregular, or improper in the fact that government attorneys have been and are attorneys for the government officers and employees who have appeared in the case, and that fact, standing alone, does not bring the United States into the case as a party.[2]

■ That the United States is interested in the issues pending in the district court case is patent, and especially is it interested in the water impounded behind Friant Dam; and the issues, when decided, including interlocutory orders, are subject to and with little doubt will be appealed to the United States Court of Appeals. It is the claim of the United States that there is irreparable waste under the court's order of April 24, 1953, and that waste of water

2. See concurring opinion by Judge Pope of this court in United States v. Dollar, 9 Cir., 1952, 196 F.2d 551, 554. In the following cases the defendants were agents of the United States and appeared in court by the Attorney General. In each of them the court entertained the actions but declared the United States was not a party: United States v. Lee, 1882, 106 U.S. 196, 1 S.Ct. 240, 27 L. Ed. 171; Land v. Dollar, 1947, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209; Philadelphia Company v. Stimson, 1912, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570; Sloan Shipyards Corp. v. U. S. Fleet Corp., 1922, 258 U.S. 549, 42 S.Ct. 386, 66 L.Ed. 762; Work v. State of Louisiana, 1925, 269 U.S. 250, 46 S.Ct. 92, 70 L.Ed. 259; Goltra v. Weeks, 1926, 271 U.S. 536, 46 S.Ct. 613, 70 L.Ed. 1074; Ickes v. Fox, 1937, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525.

is destruction of the *res* of the case. We have a duty to preserve our appellate jurisdiction in the district court case since we may well have to exercise it. Title 28 U.S.C.A. § 1651; Ex parte Republic of Peru, 1943, 318 U.S. 578, 582, 63 S.Ct. 793, 87 L.Ed. 1014; Gulf Research & Development Co. v. Harrison, 9 Cir., 1950, 185 F.2d 457; Roche v. Evaporated Milk Ass'n, 1943, 319 U.S. 21, 63 S.Ct. 938, 87 L.Ed. 1185. Our jurisdiction to entertain the United States' petition depends upon the necessity of our order to preserve the *res* in the appeal. It is obvious that the *res*, to the extent that water is wasted because of the district court's order, is destroyed. We therefore, hold that the United States has the right to petition us and that we have the right to entertain the petition of the United States in prohibition or mandamus. See Ex parte State of New York, No. 1, 1921, 256 U.S. 490, 503, 41 S.Ct. 588, 65 L.Ed. 1057; Ex parte Republic of Peru, 1943, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014.

■ The Rank v. Krug action has been on trial for aproximately two hundred court days, and the relevant water problems have been presented in detail with governmental experts and counsel actively participating. However, the United States is not a party to the action, and no judgment in the case can be entered against it, and no judgment that may be entered in the case can be *res judicata* as to the United States.

See United States v. Dollar, 9 Cir., 1952, 196 F.2d 551; United States v. Lee, 1882, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171, and the line of cases following the Lee case.

The showing to us is conclusive of the fact that the agencies, officials, and employees of the United States whose duties touch the subject matter of the Rank v. Krug action have been diligent in seeing that the court is fully informed as to applicable fact and law. And it is beyond question that the court is now better informed on all relevant facts than any other person not specially interested in the matter. The evidence is all in and the case awaits only argument and incidental rulings before it stands submitted for decision.

The court's action in making the consent order of April 24, 1953 (a modification of previous consent orders), precipitated the instant proceeding. The order was strictly upon the merits and was made with the commendable intention of protecting all concerned as well as possible until the issues are decided. The judge presiding acted from his accumulated information and upon advice of experts to preserve the *status quo* as nearly as could be. And the court acted only after consent to the order had been given by all parties and by the Secretary of the Interior of the United States, and the United States Attorney General.[3] A summation of the order

3. The order of the judge in Rank v. Krug, which precipitated the instant petition of the United States, was made after an appeal had been made to it to take action to assure adequate water for plaintiffs during the 1953 summer season. The plaintiffs were complaining that the water being released was insufficient and a conference was held on the 21st day of April, 1953, as to the amount of water reasonably necessary to be released. The Honorable Peirson M. Hall, the presiding judge, after stating that the meeting was as has just been related and that any concession or rescission on anybody's part would have no effect on the ultimate decision, asked if all agreed, and each person present answered in the affirmative. Present at the meeting in addition to the judge were: Mr. Burton, an attorney for the Bureau of Reclamation; Mr. Rowe, attorney for plaintiffs; Mr.

Goldberg, a deputy California State Attorney General; Mr. McPherson, a Special Assistant United States Attorney General, attorney for defendants; and Messrs. Child, Abercrombie, Green and Reavis, representing the fifteen defendant water districts.

Following is a portion of the transcript of the April 21, 1953, conference, as set out in an affidavit by Judge Hall: [All emphasis supplied.]

"Mr. McPherson: They have asked the Bureau to consent to it [the order]; and while the representative of the Bureau was here the other day, he said he would agreed to 300 second-feet release through September.

"I have been instructed by the Attorney-General not to agree to any order that requires a predetermined release at Friant. * * * I am not informing the court that he would not agree to

which authorized the "Court's Agent" to release water from Friant Dam as directed in the order, is set out in the margin.[4]

that; I am sure he would, due to the fact that the districts have, without exception, expressed approval.

"* * * I will ask him for authority to consent to it."

On April 22, 1953:

"Mr. McPherson: * * * I had hoped that you would * * * agree on the form of the order as you propose to enter it, if that can be done, because I am required to teletype Washington. Mr. McKay wants to see it, as does the Attorney General, * * *."

On April 24, 1953:

"Mr. McPherson: Yesterday morning I received a telephone call, which conversation was confirmed by wire from Mr. J. Edward Williams, Acting Assistant Attorney General in charge of the Lands Division, authorizing me to consent to the entry of the order as proposed by the court to the counsel at that meeting in your office day before yesterday——."

"* * *.

"Mr. McPherson: —Wednesday afternoon, and it was teletyped to the Department of Justice as well as to the Department of the Interior, and provided that the consent, the authorization, came from the Department of Justice, and provided that the Department of the Interior approved."

Mr. McPherson then moved an amendment to the proposed order, and the court denied it.

"Mr. McPherson: Very well, your Honor. * * *.

"The Court: Does your consent stand?

"Mr. McPherson: Let me finish my statement, then I will indicate my consent—I haven't given that as yet. I am in receipt of a teletype from Mr. Boke, one of the official defendants in the case, speaking for himself, Blote and Durant, and also have an oral confirmation of that from Mr. Rodner, the other official defendant, indicating that they are willing to have the order entered, on my advice that the United States and these defendants are not prejudiced in the further handling of this litigation, which I have done, based upon the recitals in the order that it is solely a compromise and is without prejudice to the position of any or either of the parties.

"The Court: And I suppose also upon the statements that all counsel have made in the record.

"Mr. McPherson: Yes. And further that the record shows a like statement by all counsel giving the consent of everyone, except counsel for the plaintiffs who, though not consenting, agree to waive findings of fact and conclusions of law, and also to waive any right of appeal he might have from the order.

"And based upon those assumptions, I consent to the entry of the order as made.

"Mr. Rowe: To make it clear——

"Mr. McPherson: I forgot to tell the court—I forgot to mention a telegram from Mr. Fred D. Aandahl, Assistant Secretary of the Department of the Interior in charge of water and power, who also authorizes my consent upon the conditions stated and upon my giving the advice which I did give, to the effect they would not be prejudiced by the order.

"The Court: Very well."

In another portion of Judge Hall's affidavit, he quotes from the transcript of the record in Rank v. Krug, a statement he made on April 22, 1953, to-wit: "As I have indicated repeatedly, I will not make an order here which is appealable, unless I take the time to draw findings of facts and conclusions of law."

4. The summation of Judge Hall's order of April 24, 1953, by the United States as set out in its petition, is as follows and appears to be substantially correct:

"1. Requires the performance of functions and duties by defendants Blote and Rodner which are contrary to and different from the duties and obligations imposed upon them in their official capacities. That fact likewise prevailed in regard to defendant Boke, prior to his resignation from office.

"2. Requires the release of water from Friant Dam into the San Joaquin River in an amount not less than 400 cubic feet per second.

"3. Necessitates the expenditure of funds by the United States of America for the improvement of private property.

"4. Requires the performance of many acts by employees of the Bureau of Reclamation regarding river improvement and the delivery of water for the benefit of plaintiffs and other landowners situated below Friant Dam.

"5. Requires the performance of many acts by the employees of the United States of America who are not before the Respondent Court.

"6. Provides for the appointment of a 'Court Agent' with broad powers to re-

We deem it to be a wholly unwarranted discourtesy to the trial judge and to the highest United States trial court that the

instant proceeding was initiated without the withdrawal of the consent given and even without the knowledge of the Special Assistant United States Attorney General who had been given the authority to consent to the order.[5] It is practically inconceivable, and we do not believe, that either Mr. Brownell, the Attorney General of the United States, or Mr. McKay, the United States Secretary of the Interior, knowingly would have authorized such action. However, we view the institution of the instant proceeding as an effective withdrawal of consent to the order. The showing before us reveals plainly that the court would not have made the order but for the consent given. Without such consent there seems to be no color of an argument to the effect that the district court had the jurisdiction to order its agent to enter upon and exercise dominion over United States property; and the court well understood the situation. See Larson v. Domestic and Foreign Corp., 1949, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628.

We therefore hold the order of the district court of April 24, 1953, to be ineffective from and after the date of the institution of the instant proceeding in this court. And we decline at the present juncture of the instant proceeding and of the Rank v. Krug case to interfere with the completion of the trial of the latter case.

Nothing could be more obvious than that the amicable relations between the United States (through the Secretary of the Interior and the Attorney General), and the moving parties in the district court case under the presiding direction of Judge Hall, should continue through the present dry summer season to the end that irreparable injury should be held to the possible minimum. Therefore, this opinion and decisions indicated are not to be taken as prejudicial to the further cooperation of the

United States officials and the trial court, through consent orders or otherwise, to prevent irreparable injury to users of water.

Should the trial court within ten days from date of filing of this opinion enter its order withdrawing its order of April 24, 1953, in accord with this opinion, this court will enter its order declining the issuance of any writ. Otherwise, this court will order the issuance of the appropriate writ in accordance with this opinion.

POPE, Circuit Judge (concurring).

With the minor exception hereafter noted I concur in Judge Stephens' opinion. It is apparent that if the case of Rank v. Krug should ever reach this court on appeal from final judgment, we may then be confronted with a problem similar to that discussed in Larson v. Domestic & Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628. Our present opinion concerns only the order of April 24, 1953, and that for the reason that we may now move only so far as necessary to protect our appellate jurisdiction against loss of what Judge Stephens calls "the *res* of the case." This limitation of the scope of our opinion should not be construed to be an expression of our views as to those questions which we may properly consider if there should be such an appeal.

My own interpretation of the so-called "consent to the order" of April 24 gives it a rather limited effect. When the colloquy quoted in footnote 3 of the opinion took place, Mr. McPherson, the Special Assistant to the Attorney General was representing only Boke, Blote, Rodner and Durant. The United States was not a party, and neither the Secretary of the Interior nor the Commissioner of Reclamation had been served. And while McPherson, as attorney for those he did rep-

---

quire the performance of acts by the Bureau of Reclamation and the expenditure of funds of the United States of America.

"7. Requires payment by the United States of America of compensation to the 'Court Agent'."

5. Judge Hall, by affidavit, quotes Mr. McPherson as saying on June 30, 1953:

"* * * and in view of the issuance of the writ, of which I received notice for the first time this morning myself. * * * As the record shows, I did not know of the application for the issuance of the writ until two or three minutes before or after Judge Hall was served with it this morning."

resent, naturally sought the approval of the Departments of Justice and Interior, the approval was to the effect that Boke, Blote, Rodner and Durant might consent to the order. These were the four whose previous efforts to have the case dismissed on the ground that it was a suit against the United States, had been denied. In short, as I view it, it was these four defendants alone who consented. I cannot see that the United States, as such, consented.

In my opinion, the extent to which the April 24 order went was such as to raise serious doubts as to the power of the court to issue it, either with or without the consent of the United States, and regardless of the presence or absence of indispensable parties.

The respondent court, like the Supreme Court and courts of appeals, is a Constitutional court. Cf. Public Service Commissioner of Puerto Rico v. Havemeyer, 296 U.S. 506, 518, 56 S.Ct. 360, 80 L.Ed. 357. Its jurisdiction is limited to "cases" and "controversies" under Art. III, § 2 of the Constitution. Such courts "share in the exercise of the judicial power defined in that section, can be invested with no other jurisdiction, * * * with no power in Congress to provide otherwise." Ex parte Bakelite Corp., 279 U.S. 438, 449, 49 S.Ct. 411, 412, 73 L.Ed. 789. The court, in the exercise of its jurisdiction to determine and adjudicate water rights, would of course have power to make any order necessary or appropriate to preserve the status quo. To that end it could exercise its power to grant an interlocutory injunction, or to appoint a receiver. Such are accepted means whereby courts commonly exercise their judicial power. But the order here in question goes far beyond anything which courts, acting in a purely judicial capacity, have traditionally undertaken to do. Here the court, through its agent, is about to tell the Bureau of Reclamation what work is to be done on or near the pumps of the water users. The Bureau may reduce the quantity of water discharged down stream only if the court's agent agrees that the reduction will allow efficient operation of the pumps, and reduction below 400 second-feet may be made only with the approval of the court. The Bureau must do work on the water users' pumps as the court's agent may, in his opinion, think required.[1]

In substance, the court has undertaken to manage and control the flow from Friant Dam, pendente lite, through the court's agent. The agent's functions resemble those of a water master or water commissioner. In California, such an official is appointed by a state administrative agency or department.[2] In Montana, the State district court appoints a water commissioner to distribute the waters adjudicated, or about to be adjudicated by the court, and he adjusts headgates, employs labor and repairs ditches, all under the directions of the judge, given by telephone or otherwise.[3] But the courts of Montana may be invested with administrative powers. Porter v. Investors' Syndicate, 287 U.S. 346, 347, 53 S.Ct. 132, 77 L.Ed. 354. So may federal legislative courts like those of the District of Columbia. Keller v. Potomac Elec. Co., 261 U.S. 428, 43 S.Ct. 445, 67 L.Ed. 731; Postum Cereal Co. v. Calif. Fig Nut Co., 272 U.S. 693, 47 S.Ct. 284, 71 L.Ed. 478; Federal Radio Comm. v. General Electric Co., 281 U.S. 464, 50 S.Ct. 389, 74 L.Ed.

---

1. Paragraph 1(d) of the order provides in part: "The Bureau of Reclamation will do and perform such work and alterations upon said pumps and/or the area adjacent to them, and such other physical work at other pumps and places on the river where pumps are taking water directly from the channel of the river as in the opinion of the Court's Agent will permit such pumps to operate as specified in paragraph 1(b) hereof. In the event any other changes or modifications or alterations of pumps pumping direct- ly from the river or of the land or river adjacent thereto are necessary in the opinion of the Court's Agent shall notify the Bureau of Reclamation which shall promptly do and perform such repairs, work, or modifications."

2. Water Code, State of California, Deering's California Codes, § 4050.

3. Revised Codes of Montana, 1947, §§ 89–1001 to 89–1024.

969. But in the cases last cited, the Supreme Court, deriving its powers solely from Art. III, § 2, could not entertain them for purposes of review or appeal.

I do not see how the respondent court, likewise limited by Art. III, § 2, could undertake by agent or otherwise, the administrative or executive functions set up in this order. The limitations on a constitutional court were stated by Chief Justice Taft in Old Colony Tr. Co. v. Comm'r. Int. Rev., 279 U.S. 716, 724, 49 S.Ct. 499, 502, 73 L.Ed. 918 as follows: "The Circuit Court of Appeals is a constitutional court under the definition of such courts as given in the Bakelite Case, supra, and a case or controversy may come before it, *provided it involves neither advisory nor executive action by it.*" (Emphasis supplied.)

Such a court may enjoin action where necessary to preserve the status quo, but it may not create rights, nor administratively execute them. Thus, while a district court may enjoin the collection of a tax based on an arbitrary overvaluation of property, it may not determine what tax would be valid. Rowley v. Chicago & N. W. Ry., 293 U.S. 102, 112, 55 S.Ct. 55, 79 L.Ed. 222, it may cancel a franchise to take water for breach thereof, but not annul it under a power reserved in the grant, Public Service Commission of Puerto Rico v. Havemeyer, 296 U.S. 506, 518, 56 S.Ct. 360, 80 L.Ed. 357, it may set aside a confiscatory public utility rate but not prescribe a valid one, Central Kentucky Natural Gas Co. v. Railroad Comm., 290 U.S. 264, 272, 54 S.Ct. 154, 78 L.Ed. 307.

As it appears to me, the order of April 24, 1953, amounted to putting the district court in the water distributing business. I am not aware of any authority upon this point. The dictum of Judge Bourquin in Sain v. Montana Power Co., D.C., 20 F. Supp. 843, 847, failed to note that Montezuma Canal Co. v. Smithville Canal Co., 218 U.S. 371, 385, 31 S.Ct. 67, 54 L.Ed. 1074, there cited, dealt with an order of the Arizona territorial courts. So I am reduced from "the high ground of authority to the low ground of principle". But it seems to me that a district court may not assume the administration here under-taken, any more than such a court, while trying a suit to enjoin an adjoining landowner from excavating so as to cause subsidence of plaintiff's land and building, could appoint an agent to locate the place and to supervise the work of making the excavation.

However well adapted this order may have been to accomplish a common sense result, I do not see how power to issue it could exist.

The one statement in the opinion of Judge Stephens in which I cannot concur is the last sentence in the next to the last paragraph which says: "Therefore, this opinion and decisions indicated are not to be taken as prejudicial to the further cooperation of United States officials and the trial court, through consent orders or otherwise, to prevent irreparable injury to users of water." Clearly the United States and the plaintiffs in the suit mentioned are at liberty to cooperate by mutual consent as much as they please. But I cannot agree that they may do so "through consent orders" of the character of that now before us, for I think that the court is without power to participate in such an enterprise.