## DUGAN ET AL. *v.* RANK ET AL.

No. 31.  Argued January 7, 1963.—Decided April 15, 1963.*

─────────

*Together with No. 115, *Delano-Earlimart Irrigation District et al.* v. *Rank et al.*, on certiorari to the same Court.

610

*Solicitor General Cox* argued the cause for petitioners in No. 31. With him on the brief were *J. William Doolittle, William H. Veeder* and *Roger P. Marquis.*

*B. Abbott Goldberg* argued the cause for petitioners in No. 115. On the brief were *Denver C. Peckinpah, Adolph Moskovitz, James K. Abercrombie, Irl Davis Brett* and *J. O. Reavis.*

*Claude L. Rowe* argued the cause for respondents in both cases. With him on the briefs was *John H. Lauten.*

MR. JUSTICE CLARK delivered the opinion of the Court.

This injunction suit, filed in 1947 by water right claimants along the San Joaquin River below Friant Dam, California, and against local officials of the United States Bureau of Reclamation, a number of Irrigation and Utility Districts and, subsequently, against the United States as well, sought to prevent the storing and diverting of water at the dam, which is part of the Central Valley Reclamation Project. 50 Stat. 844, 850 (1937). See *United States* v. *Gerlach Live Stock Co.,* 339 U. S. 725 (1950). The defense interposed was that the suit was against the United States and, therefore, beyond the jurisdiction of the courts, it not having consented to be sued. In 1956 the District Court ordered the injunction issued unless the Government constructed a "physical solution" [1]

---

[1] A procedure authorized by California law whereby existing rights to the use of water are protected and excess waters are put to beneficial use.

which would afford the landowners a supply of water simulating that of the past. *Rank* v. *Krug,* 142 F. Supp. 1. The Court of Appeals reversed as to the United States, finding that it had not consented to be sued. However, as to the officials, it affirmed on the ground that the United States had neither acquired nor taken the claimed water rights and that the officials were therefore acting beyond their statutory authority. *California* v. *Rank,* 293 F. 2d 340 and 307 F. 2d 96. No. 31 is the petition of the local Reclamation Bureau officials, and No. 115 is that of the Irrigation and Utility Districts. Both cases proceed from the same Court of Appeals opinion. The importance of the question to the operation of this vast federal reclamation project led us to grant certiorari. 369 U. S. 836 and 370 U. S. 936. We have concluded that the Court of Appeals was correct in dismissing the suit against the United States; that the suit against the petitioning local officials of the Reclamation Bureau is in fact against the United States and they must be dismissed therefrom; that the United States either owned or has acquired or taken the water rights involved in the suit and that any relief to which the respondents may be entitled by reason of such taking is by suit against the United States under the Tucker Act, 28 U. S. C. § 1346. These conclusions lead to a reversal of the judgment insofar as suit was permitted against the United States through Bureau officials.

## I. Aspects of the Central Valley Reclamation Project Involved.

The Project was authorized by the Congress and undertaken by the Bureau of Reclamation of the Department of the Interior pursuant to the Act of August 26, 1937, 50 Stat. 844, 850. It is generally described in sufficient detail for our purposes in *United States* v. *Gerlach Live Stock Co., supra,* and *Ivanhoe Irrigation District* v. *McCracken,* 357 U. S. 275 (1958). See Graham, The Cen-

tral Valley Project: Resource Development of a Natural Basin, 38 Cal. L. Rev. 588, 591 (1950), for a description and citation of federal authorizations.

The grand design of the Project was to conserve and put to maximum beneficial use the waters of the Central Valley of California,[2] comprising a third of the State's territory, and the bowl of which starts in the northern part of the State and, averaging more than 100 miles in width, extends southward some 450 miles. The northern portion of the bowl is the Sacramento Valley, containing the Sacramento River, and the southern portion is the San Joaquin Valley, containing the San Joaquin River. The Sacramento River rises in the extreme north, runs southerly to the City of Sacramento and then on into San Francisco Bay and the Pacific Ocean. The San Joaquin River rises in the Sierra Nevada northeast of Fresno, runs westerly to Mendota and then northwesterly to the Sacramento-San Joaquin Delta where it joins the Sacramento River. The Sacramento River, because of heavier rainfall in its watershed, has surplus water, but its valley has little available tillable soil, while the San Joaquin is in the contrary situation. An imaginative engineering feat has transported some of the Sacramento surplus to the San Joaquin scarcity and permitted the waters of the latter river to be diverted to new areas for irrigation and other needs. This transportation of Sacramento water is accomplished by pumping water from the Sacramento-San Joaquin Delta into the Delta-Mendota Canal, a lift of some 200 feet. The water then flows by gravity through this canal along the west side of the San Joaquin Valley southerly to Mendota, some 117 miles, where it is dis-

---

[2] See the Feasibility Report of Secretary Ickes to President Franklin D. Roosevelt, dated November 26, 1935, and approved by the President on December 2, 1935, reprinted in 90 F. Supp. 823–827 and in 1 Engle, Central Valley Project Documents, H. R. Doc. No. 416, 84th Cong., 2d Sess. 562–567 (1956).

charged into the San Joaquin River. The waters of the San Joaquin River are impounded by a dam constructed at Friant, approximately 60 miles upstream from Mendota. Friant Dam stores the water in Millerton Lake from which it is diverted by the Madera Canal on the north to Madera County and the Friant-Kern Canal on the south to the vicinity of Bakersfield for use in those areas for irrigation and other public purposes.

The river bed at Friant is at a level approximately 240 feet higher than at Mendota, 142 F. Supp. 173, which prevents the Sacramento water from being carried further upstream and replenishing the San Joaquin in the 60-mile area between Mendota and Friant Dam, thereby furnishing Sacramento River water for the entire length of the San Joaquin below Friant Dam. This 60-mile stretch of the San Joaquin—and more particularly that between Friant Dam and Gravelly Ford, 37 miles downstream—is the approximate area involved in this litigation. It has been the subject of cooperative studies by the state, local, and federal governments for many years. Indeed the initial planning of the Project recognized, as indicated by the engineering studies included in the plan, that the water flow on the San Joaquin between Friant Dam and Mendota would be severely diminished. See 18 Op. Cal. Atty. Gen. 31, 33–34 (1951). All of the parties recognized the existence of water rights in the area and the necessity to accommodate or extinguish them. Report No. 3, Calif. Water Project Authority, Definition of Rights to the Waters of the San Joaquin River Proposed for Diversion to Upper San Joaquin Valley, 1–2 (1936). The principal alternative, as shown by the reports of the United States Reclamation Bureau to the Congress and the subsequent appropriations of the Congress, was to purchase or pay for infringement of these rights. As early as 1939 the Government entered into negotiations ultimately culminating in the purchase of

water rights or agreements for substitute diversions or periodic releases of water from Friant Dam into the San Joaquin River. Graham, The Central Valley Project: Resource Development of a Natural Basin, *supra*. As of 1952 the United States had entered into 215 contracts of this nature involving almost 12,000 acres, of which contracts some 100 require the United States to maintain a live stream of water in the river.

However, agreements could not be reached with some of the claimants along this reach of the river, and this suit resulted.

## II. HISTORY OF THE LITIGATION.

The suit was filed in 1947 and has been both costly and protracted.[3] It involves some 325,000 acres of land including a portion of the City of Fresno. See map in 142 F. Supp., at 40. Originally filed in the Superior Court of California, it sought to enjoin local officials of the United States Reclamation Bureau from storing or diverting water to the San Joaquin at Friant Dam or, in the alternative, to obtain a decree of a physical solution of water rights. The action was removed to the United States District Court for the Southern District of California. The named plaintiffs claimed to represent a class of owners of riparian as well as other types of water rights. In

---

[3] The trial, which lasted more than 200 days, required 30,000 pages of record and produced hundreds of orders. Opinions below are *State* v. *Rank*, 293 F. 2d 340 (C. A. 9th Cir. 1961); *Rank* v. *(Krug) United States*, 142 F. Supp. 1 (D. C. S. D. Cal. 1956). Related cases involving intermediate orders of the District Court are *Rank* v. *Krug*, 90 F. Supp. 773 (D. C. S. D. Cal. 1950); *United States* v. *United States District Court*, 206 F. 2d 303 (C. A. 9th Cir. 1953); *California* v. *United States District Court*, 213 F. 2d 818 (C. A. 9th Cir. 1954); *Rank* v. *United States*, 16 F. R. D. 310 (D. C. S. D. Cal. 1954); *City of Fresno* v. *Edmonston*, 131 F. Supp. 421 (D. C. S. D. Cal. 1955).

addition to the local officials of the Reclamation Bureau two of the Irrigation Districts receiving diverted water from Millerton Lake were originally made defendants and later the other Irrigation and Utility District defendants were joined.

The complaint challenged the constitutional authority of the United States to operate the Project. A three-judge court was impaneled pursuant to 28 U. S. C. § 2282, and it decided this issue presented no substantial constitutional question. *Rank* v. *Krug,* 90 F. Supp. 773 (D. C. S. D. Cal. 1950). This left undecided the question of whether the Secretary of the Interior and Bureau of Reclamation officials had statutory authority to acquire the water rights involved. The issue remained dormant until the Delta-Mendota Canal was completed in 1951, 142 F. Supp., at 45, and the Government began to reduce the flow of water through Friant Dam. By consent, temporary restraining orders were entered controlling the releases covering the years 1951, 1952, and part of 1953. In June of the latter year the United States withdrew its consent with the approval of the Court of Appeals, *United States* v. *United States District Court,* 206 F. 2d 303. The District Court then ordered the United States joined as a party on the basis of the McCarran amendment, Act of July 10, 1952, 66 Stat. 560, 43 U. S. C. § 666, *infra,* n. 5. Friant Dam has, however, been operated by the United States without judicial interference since June 30, 1953.

The District Court announced its opinion in the case on February 7, 1956, 142 F. Supp. 1, and the judgment was entered the next year. It declared the water rights of all of the claimants, the members of the class they claimed to represent and the intervenors, Tranquility Irrigation District and the City of Fresno, as against the United States, the Reclamation Bureau officers and the Districts. It did not grant relief as between individual

claimants of water rights or adjudicate the priority of these rights among them. 142 F. Supp., at 36. The judgment declared that the claimants

"have been, now are, and will be entitled to the full natural flow of the San Joaquin River past Friant at all times . . . unless and until the physical solution hereinelsewhere described is erected and constructed [by the defendants] within a reasonable time, and thereafter operated as hereinelsewhere set forth." Transcript of Record, Vol. III, p. 993.

The physical solution was a series of 10 small dams to be built at the expense of the United States along the stretch of river involved for the purpose of keeping the water at a level "equivalent" to the natural flow, 142 F. Supp., at 166, or to simulate it at a flow of 2,000 feet per second. 142 F. Supp., at 169.

In summary, the court held that the United States was a proper party under the McCarran amendment; that the claimants had vested rights to the full natural flow of the river superior to any rights of the United States or other defendants; that the operation of Friant Dam does not permit sufficient water to pass down the river to satisfy these rights; that Congress has not authorized the taking of these rights by physical seizure but only by eminent domain exercised through judicial proceedings; that as a consequence the impounding at Friant Dam constitutes an unauthorized and unlawful invasion of rights for which damages are not adequate recompense; that this requires all of the defendants, including the United States, to be enjoined from storing or diverting or otherwise impeding the full natural flow of the San Joaquin at Friant Dam unless within a reasonable time and at its own expense the United States, or the Districts, build the dams aforesaid and put them into operation; that

the United States is subject to the California county of origin and watershed of origin statutes, Calif. Water Code § 10505, and §§ 11460–11463, and must first satisfy at the same charge as made for agricultural water service the full needs of the City of Fresno and Tranquility Irrigation District before diverting San Joaquin water to other areas; and finally that the United States is also subject to Calif. Water Code §§ 106 and 106.5 as to domestic-use water priority and the power of municipalities to acquire and hold water rights.[4]

The Court of Appeals reversed as to the joinder of the United States, holding that it could not be made a party without its consent. It likewise found that the United States was authorized to acquire, either by physical seizure or otherwise, such of the rights of the claimants as it needed to operate the Project and that this power could not be restricted by state law. However, it found that no such authorized seizure had occurred because the Government had not sufficiently identified what rights it was seizing, and because of this equivocation of the federal officials, there was a trespass rather than a taking. It concluded, therefore, that the petitioner Reclamation Bureau officials had acted beyond their statutory authority and affirmed the injunctive features of the judgment. On rehearing, the injunction was modified to make it inapplicable to the petitioner Districts in No. 115 but the court refused to dismiss as to them.

### III. The United States as a Party.

We go directly to the question of joinder of the United States as a party. We agree with the Court of Appeals on this issue and therefore do not consider the contention

---

[4] The last two sections of the judgment are dealt with in cause No. 51, *City of Fresno* v. *California,* decided today, *post,* p. 627.

at length. It is sufficient to say that the provision of the McCarran amendment, 66 Stat. 560, 43 U. S. C. § 666,[5] relied upon by respondents and providing that the United States may be joined in suits "for the adjudication of rights to the use of water of a river system or other source," is not applicable here. Rather than a case involving a *general* adjudication of "all of the rights of various owners on a given stream," S. Rep. No. 755, 82d Cong., 1st Sess. 9 (1951), it is a private suit to determine water rights solely between the respondents and the United States and the local Reclamation Bureau officials. In addition to the fact that all of the claimants to water rights along the river are not made parties, no relief is either asked or granted as between claimants, nor are priorities sought to

---

[5] 43 U. S. C. § 666:

"(a) Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances: *Provided,* That no judgment for costs shall be entered against the United States in any such suit.

"(b) Summons or other process in any such suit shall be served upon the Attorney General or his designated representative.

"(c) Nothing in this section shall be construed as authorizing the joinder of the United States in any suit or controversy in the Supreme Court of the United States involving the right of States to the use of the water of any interstate stream." July 10, 1952, c. 651, Title II, § 208, 66 Stat. 560.

be established as to the appropriative and prescriptive rights asserted. But because of the presence of local Reclamation Bureau officials and the nature of the relief granted against them, the failure of the action against the United States does not end the matter. We must yet deal with the holding of the Court of Appeals that the suit against these officials is not one against the United States.

IV. Relief Granted Against Federal Officers.

The Court of Appeals correctly held that the United States was empowered to acquire the water rights of respondents by physical seizure. As early as 1937, by the Rivers and Harbors Act, 50 Stat. 844, 850, the Congress had provided that the Secretary of the Interior "may acquire by proceedings in eminent domain, or otherwise, all lands, rights-of-way, water rights, and other property necessary for said purposes . . . ." Likewise, in *United States v. Gerlach Live Stock Co., supra,* this Court implicitly recognized that such rights were subject to seizure when we held that Gerlach and others were entitled to compensation therefor. The question was specifically settled in *Ivanhoe Irrigation District v. McCracken, supra,* where we said that such rights could be acquired by the payment of compensation "either through condemnation or, if already taken, through action of the owners in the courts." 357 U. S., at 291. However, the Court of Appeals, in examining the extent of the taking here, concluded that rather than an authorized taking of water rights, the action of the Reclamation Bureau officials constituted an unauthorized trespass. The court observed that the San Joaquin "will not be dried up" below Friant because the Government has contracted with other water right owners to maintain "a live stream," and as the flow of water varies from day to day the respondents do not now and never

will know what part of their claimed water rights the Government has taken or will take.

> "A casual day by day taking under these circumstances constitutes day to day trespass upon the water right. . . . The cloud cast prospectively on the water right by the assertion of a power to take creates a present injury above what has been suffered by the interference itself—a present loss in property value which cannot be compensated until it can be measured." 293 F. 2d, at 358.

The court, therefore, permitted the suit against the petitioning Reclamation Bureau officers as one in trespass, which led it to affirm, with modification, the injunctive relief granted by the District Court.

Rather than a trespass, we conclude that there was, under respondents' allegations, a partial taking of respondents' claimed rights. We believe that the Court of Appeals incorrectly applied the principle of *Larson* v. *Domestic & Foreign Corp.*, 337 U. S. 682 (1949), and other cases in the field of sovereign immunity. The general rule is that a suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration," *Land* v. *Dollar*, 330 U. S. 731, 738 (1947), or if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act." *Larson* v. *Domestic & Foreign Corp., supra,* at 704; *Ex parte New York*, 256 U. S. 490, 502 (1921). The decree here enjoins the federal officials from "impounding, or diverting, or storing for diversion, or otherwise impeding or obstructing the full natural flow of the San Joaquin River . . . ." Transcript of Record, Vol. III, p. 1021. As the Court of Appeals found, the Project "could not operate without impairing, to some degree, the full natural flow of the river." Experience of over a decade along the stretch

of the San Joaquin involved here indicates clearly that the impairment was most substantial—almost three-fourths of the natural flow of the river. To require the full natural flow of the river to go through the dam would force the abandonment of this portion of a project which has not only been fully authorized by the Congress but paid for through its continuing appropriations. Moreover, it would prevent the fulfillment of the contracts made by the United States with the Water and Utility Districts, which are petitioning in No. 115. The Government would, indeed, be "stopped in its tracks . . . ." *Larson* v. *Domestic & Foreign Corp., supra,* at 704.

The physical solution has no less direct effect. The Secretary of the Interior, the President and the Congress have authorized the Project as now constructed and operated. Its plans do not include the 10 additional dams required by the physical solution to be built at government expense. The judgment, therefore, would not only "interfere with the public administration" but also "expend itself on the public treasury . . . ." *Land* v. *Dollar, supra,* at 738. Moreover, the decree would require the United States—contrary to the mandate of the Congress—to dispose of valuable irrigation water and deprive it of the full use and control of its reclamation facilities. It is therefore readily apparent that the relief granted operates against the United States.

Nor do we believe that the action of the Reclamation Bureau officials falls within either of the recognized exceptions to the above general rule as reaffirmed only last Term. *Malone* v. *Bowdoin,* 369 U. S. 643. See *Larson* v. *Domestic & Foreign Corp., supra; Santa Fe Pac. R. Co.* v. *Fall,* 259 U. S. 197, 199 (1922); *Scranton* v. *Wheeler,* 179 U. S. 141, 152–153 (1900). Those exceptions are (1) action by officers beyond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exer-

cised are constitutionally void. *Malone* v. *Bowdoin, supra,* at 647. In either of such cases the officer's action "can be made the basis of a suit for specific relief against the officer as an individual . . . ." *Ibid.* But the fact that the Court of Appeals characterized the action of the officers as a "trespass" does not at all establish that it was either unconstitutional or unauthorized. As this Court said in *Larson, supra,* at 693:

> "The mere allegation that the officer, acting officially, wrongfully holds property to which the plaintiff has title does not meet [the] requirement [that it must also appear that the action to be restrained or directed is not action of the sovereign]. True, it establishes a wrong to the plaintiff. But it does not establish that the officer, in committing that wrong, is not exercising the powers delegated to him by the sovereign."

And, the Court added:

> "the action of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property) can be regarded as so 'illegal' as to permit a suit for specific relief against the officer as an individual only if it is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void." *Id.,* at 701–702.

Since the Government, through its officers here, had the power, under authorization of Congress, to seize the property of the respondents, as held by the Court of Appeals and recognized by several cases in this Court, and this power of seizure was constitutionally permissible, as we held in *Ivanhoe, supra,* there can be no question that this case comes under the rule of *Larson* and *Malone, supra.* The power to seize which was granted here had no limitation placed upon it by the Congress, nor did the Court of

Appeals bottom its conclusion on a finding of any limitation. Having plenary power to seize the whole of respondents' rights in carrying out the congressional mandate, the federal officers *a fortiori* had authority to seize less. It follows that if any part of respondents' claimed water rights were invaded it amounted to an interference therewith and a taking thereof—not a trespass.

We find no substance to the contention that respondents were without knowledge of the interference or partial taking. Nor can we accept the view that the absence of specificity as to the amount of water to be taken prevents the assessment of damages in this case. From the very beginning it was recognized that the operation of Friant Dam and its facilities would entail a taking of water rights below the dam. Indeed, it was obvious from the expressed purpose of the construction of the dam—to store and divert to other areas the waters of the San Joaquin—and the intention of the Government to purchase water rights along the river.[6] Pursuant to this announced intention the Government did in fact enter into numerous contracts for water rights, as we have previously noted. While it is true, as the Court of Appeals observed, that the Government did not announce that it was taking water rights to a specified number of "gallons" or, for that matter, "inches" of water, see 293 F. 2d 340, 357–358, we do not think this quantitative uncertainty precludes ascertainment of the value of the taking. On this point we conclude that the Court of Appeals was in error. We find no uncertainty in the taking.

It is likely that an element of uncertainty may have been drawn by the Court of Appeals from the Secretary of the Interior's statement in a letter that the operation of Friant Dam "is an administrative one, voluntarily assumed and voluntarily to be executed." 293 F. 2d 340,

---

[6] See note 2, *supra*.

356, n. 8. This alone might present a picture of a spillway being opened and closed at the whim of the Secretary. We view this statement, however, as merely notice to the court that the Secretary intended to operate the water works fairly, but solely on his own, without court interference. Neither he nor the United States was a party. Even if the statement did introduce an element of uncertainty as to what exactly the Secretary might do, injunctive relief was not proper. Despite this *caveat*, damages were clearly ascertainable (see *Collier* v. *Merced Irrigation District*, 213 Cal. 554, 571–572, 2 P. 2d 790, 797 (1931)), based partially on the Secretary's prior unequivocal statement regarding his plans as to the minimum flow of water to be released into the river below the dam.[7] Parenthetically, we note that petitioners, in their brief, at p. 12, inform us that "Friant Dam has since been operated in accordance with the Secretary's stated plan, subject to adjustments required by weather and other conditions."

Damages in this instance are to be measured by the difference in market value of the respondents' land before

---

[7] On March 30, 1953, in response to a request from the district judge that the Secretary clarify his position, a letter was written by the Secretary to the Attorney General expressing his "administrative intent with respect to the operation of the Central Valley project insofar as it relates to the Friant-to-Gravelly Ford reach of the San Joaquin River." The letter specified that:

". . . the Department will release from Friant Reservoir into the bed of the river a sufficient quantity of water (1) to meet all valid legal requirements for the reasonable and beneficial use of water, both surface and underground, by reasonable methods of diversion and reasonable methods of use in that area, and (2) to provide, in addition thereto, a continuous live stream flowing at a rate of not less than five cubic feet per second at specified control points throughout the Friant-to-Gravelly Ford area, the last one to be at a point approximately one-half mile below the head of the Gravelly Ford Canal." Transcript of Record, Vol. VII, p. 388, n. 8.

and after the interference or partial taking. As the Supreme Court of California said in *Collier* v. *Merced Irrigation District, supra,* at 571–572.

> ". . . [T]he riparian right is a part and parcel of the land in a legal sense, yet it is a usufructuary and intangible right inhering therein and neither a partial nor a complete taking produces a disfigurement of the physical property. The only way to measure the injury done by an invasion of this right is to ascertain the depreciation in market value of the physical property. . . . There was a distinct conflict in the evidence as to whether the lands of appellant had a greater or a less market value after the taking by respondent, but there is no question of law arising on the evidence."

The right claimed here is to the continued flow of water in the San Joaquin and to its use as it flows along the landowner's property. A seizure of water rights need not necessarily be a physical invasion of land. It may occur upstream, as here. Interference with or partial taking of water rights in the manner it was accomplished here might be analogized to interference or partial taking of air space over land, such as in our recent case of *Griggs* v. *Allegheny County,* 369 U. S. 84, 89–90 (1962). See *United States* v. *Causby,* 328 U. S. 256, 261–263, 267 (1946); *Portsmouth Co.* v. *United States,* 260 U. S. 327, 329 (1922). See also 1 Wiel, Water Rights in the Western States (3d ed. 1911), § 15; 2 Nichols, Eminent Domain (3d ed. 1950), § 6.3. Therefore, when the Government acted here "with the purpose and effect of subordinating" the respondents' water rights to the Project's uses "whenever it saw fit," "with the result of depriving the owner of its profitable use [there was] the imposition of such a servitude [as] would constitute an appropriation of property for which compensation should be made." *Peabody*

v. *United States,* 231 U. S. 530, 538 (1913); *Portsmouth Co.* v. *United States, supra,* at 329.

In an appropriate proceeding there would be a determination of not only the extent of such a servitude but the value thereof based upon the difference between the value of respondents' property before and after the taking. Rather than a stoppage of the government project, this is the avenue of redress open to respondents. Since we have set aside the judgments of both the Court of Appeals and the District Court, it is appropriate that we make clear that we do not in any way pass upon or indicate any view regarding the validity of respondents' water right claims.

## V. THE IRRIGATION AND UTILITY DISTRICTS.

Similar disposition must be made of No. 115. There the petitioners are 14 Irrigation and Utility Districts which have contracts with the Government for the use of water from Millerton Lake. The Court of Appeals, as we have noted, dissolved the injunction previously granted against them by the District Court. No other relief having been sought against the Districts, it appears that they should have been dismissed from the action. In any event, in view of our disposition of No. 31, dismissal of these petitioners is now in order.

The judgment as to the dismissal of the United States is affirmed; it is reversed as to the failure to dismiss the Reclamation officials and the Irrigation and Utility Districts, and the cases are remanded to the Court of Appeals with directions that it vacate the judgment of the District Court and remand the case with instructions that the same be dismissed.

*It is so ordered.*

THE CHIEF JUSTICE took no part in the consideration or decision of these cases.