**HUGHES AIRCRAFT COMPANY,**
**Plaintiff,**

v.

**James A. SCHLESINGER, Secretary U. S. Department of Defense, et al.,**
**Defendants.**

**No. CV–74–1195–DWW.**

United States District Court,
C. D. California.

Oct. 30, 1974.

---

Latham & Watkins, Richard W. Lund, Hugh Steven Wilson, Los Angeles, Cal., for plaintiff.

William D. Keller, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief, Civ. Div., Barry J. Trilling, Asst. U. S. Atty., Los Angeles, Cal., for defendants.

## MEMORANDUM

DAVID W. WILLIAMS, District Judge.

■ As a government defense contractor, Hughes Aircraft is under an obligation to be an equal opportunity employer. To demonstrate good faith in its employment practices, Hughes, like other defense contractors, must submit an Affirmative Action Plan (AAP) to the Labor Department's Office of Federal Contract Compliance (41 CFR § 60–1.40). The AAP must discuss in depth and in a candid fashion the minority hiring, firing and promotion policies of the company. It must also provide statistical data on previous practices as well as future projections and goals for minority employment policies, and must be openly self critical and fully discuss problem areas.

Hughes submitted its 1974 Culver City plant AAP to the office of Federal Contract Compliance. Invoking the Freedom of Information Act, 5 U.S.C. § 552, the Los Angeles Chapter of the National Organization for Women requested a copy of that document from one of the defendants and Hughes brought this action to prevent disclosure.

## JURISDICTION

Federal question jurisdiction is properly in this court under 28 U.S.C. § 1331. This controversy arises under 5 U.S.C. § 552, since the plaintiff is seeking to restrain the defendants from allegedly violating its terms. In addition, the injury sought to be prevented has been sufficiently alleged to exceed the required jurisdictional amount.

■ The defendant contends that the doctrine of sovereign immunity prevents 28 U.S.C. § 1331 from providing the jurisdictional base. Sovereign Immunity does not bar this suit because the actions of the federal officers have been sufficiently alleged to be beyond their statutory powers and thus would not be the actions of the sovereign. See Dugan v. Rank, 372 U.S. 609, 621, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). In addition, if the requested relief is granted it " . . . would not expend itself on the public treasury or domain, or interfere with the public administration." Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947), nor will the processes of government be impeded. Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 704, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

## PROMULGATION OF THE REGULATION

■ Plaintiff has contended that the regulations (41 CFR Part 60–40) issued to implement the Freedom of Information Act are invalidly promulgated, because the Secretary of Labor has not issued them himself, but has delegated that duty to the Office of Federal Contract Compliance. However, the regulations in question have been issued over the signature of the Secretary of Labor and pursuant to authority expressly authorized in Executive Order 11246 as amended by Executive Order 11375. See 38 F.R. 3192–94. Feb. 2, 1973.

## EXEMPTIONS RESTRICTING DISCLOSURE OF THE AFFIRMATIVE ACTION PLAN

The plaintiff raises three statutory exemptions to prevent disclosure of its AAP. First, it claims that 5 U.S.C. §

552(b)(3) applies to material "specifically exempted from disclosure by statute." Accordingly, the plaintiff argues that its AAP is exempt under § 709(e) of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e. That section of the Civil Rights Act prohibits disclosure of information obtained by the Equal Employment Opportunities Commission pursuant to its information gathering power. The plaintiff has argued that § 709(e) is applicable since its AAP was filed pursuant to enforcement of equal employment opportunities, and contains information of similar relevance.

■■■ This contention is incorrect. Affirmative Action Plans are filed pursuant to Executive Order 11246, not Title VII. Executive Order 11246 originates in Executive Order 10925 (March 6, 1961) which antedates the Civil Rights Act and which was an early expression of executive (not congressional) policy that government contractors may not discriminate. It is information collected by the Office of Federal Contract Compliance, not by the EEOC. Thus 5 U.S.C. § 552(b)(3) is inapplicable.

Secondly, the plaintiff asserts that 18 U.S.C. § 1905 prevents disclosure of the AAP. That section establishes criminal penalties if an official discloses information which he is "not authorized by law" to disclose. However, before the statute can apply, the determination of the propriety of disclosure must have been made. Plaintiff's second ground assumes the conclusion which has yet to be reached, and thus the utility of § 1905 must await the resolution of the merits of this dispute.

Plaintiff's third ground for exemption from disclosure is based on 5 U.S.C. § 552(b)(4) and 41 CFR part 60–40. § 552(b)(4) exempts "trade secrets and commercial or financial information obtained from a person and privileged or confidential." Part 60–40 implements § 552 and regulates access to records, including AAP's filed with the Office of Federal Contract Compliance.

Under 41 CFR § 60–40.3(a) affirmative action plans must be released unless all or parts are exempt as follows:

"(1) Those portions of affirmative action plans such as goals and timetables which would be confidential commercial or financial information because they indicate, and only to the extent that they indicate, that a contractor plans major shifts or changes in his personnel requirements and he has not made this information available to the public. A determination by an agency to withhold this type of information should be made only after receiving verification and a satisfactory explanation from the contractor that the information should be withheld.

"(2) Those portions of affirmative action plans which constitute information on staffing patterns and pay scales but only to the extent that their release would injure the business or financial position of the contractor, would constitute a release of confidential financial information of an employee or would constitute an unwarranted invasion of the privacy of an employee."

The key factor in both § 552(b)(4) and 41 CFR § 60–40.3(a) is an understanding of what information in the AAP is protected because it is "confidential." The most recent and definitive discussion can be found in National Parks and Conservation Association v. Morton, D.C.Cir., 498 F.2d 765 (1974). In that action brought under the Freedom of Information Act, the Department of the Interior raised the confidentiality exemption of § 552(b) 4 as a defense. After noting that " . . . unfortunately, the statute contains no definition of the word 'confidential' " (498 F.2d at 766) the court examined past case authority, and the Congressional intent as expressed in the legislative history of the F.O.I.A. The court concluded that the purpose of the § 552(b)(4) exemption was to promote two policies—that of "encouraging cooperation with the Government by persons having informa-

tion useful to officials" (498 F.2d at 768) and protecting "persons who submit financial or commercial data to government agencies, from the competitive disadvantages, which would result from its publication." (Ibid).

With this statutory purpose in mind the court formulated the following test:

" . . . commercial or financial matter is 'confidential' for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." 498 F.2d at 770.

This test is appropriately applied here, to the release of Hughes' AAP.

The first element of the test does not prevent disclosure. Plaintiff has argued that employers will no longer be candid if disclosure is ordered. However, the government's ability to gather such information in the future does not appear to be impaired since Hughes and other defense contractors are under statutory and regulatory duties to file specific information in their AAPs. Failure to provide such information would be an act of bad faith and expose the contractor to penalties.

Additionally, the government, as intended beneficiary of the first element, has not objected to disclosure. This fact strongly indicates the inapplicability of the first element.

## COMPETITIVE DISADVANTAGE

The second element has provoked much of the discussion in this case. The issue is whether disclosure of the Hughes AAP is likely to cause substantial harm to Hughes' competitive position. To help resolve this question, the court has studied the Hughes AAP *in camera* and has requested that the parties submit affidavits of experts.

Guidance is also supplied by a recent 9th Circuit decision, Theriault v. United States, 503 F.2d 390 (1974).

The *Theriault* court notes that:

"the general rule under the Act is to allow disclosure, unless the agency involved (here Hughes) carries the burden of showing the records in question specifically fall within the protection of one or more of the nine several specified exemptions in the Act. Furthermore, the respective exemptions are to be construed narrowly." *Theriault* at p. 392.

The Circuit Court also recognized the need for "judicious weighing," and

" . . . in exercising the equity jurisdiction conferred by the Freedom of Information Act, the court must weigh the effects of disclosure and nondisclosure, according to traditional equity principles, and determine the best course to follow in the given circumstances. The effect on the public is the primary consideration." *Theriault* at p. 392.

My overall impression of Hughes' experts' affidavits is that they lack particularity. Hughes' experts conclude that the company would be hurt competitively by disclosure, but their factual basis for this conclusion is not strong. Very little in their affidavits specifically points out the connection between the information contained in the AAP and the alleged harm that would result from disclosure.

The debate concentrates on the question of whether Hughes' labor costs can be uncovered by a competitor, since the AAP reveals the number of employees at the Hughes Culver City facility. The argument is that once a competitor knows Hughes' labor costs, the competitor, having also found Hughes' costs for plant, equipment, and materials, and its profit margin, will be able to underbid Hughes on government contracts. Hughes' expert, Rutenberg, argues that the listing of employees by job categories helps rivals estimate labor costs, since competitive rates in a locality for wage, salary and fringe benefits can be known.

Government's expert, Welch, on the other hand, believes that labor costs can

only be imperfectly estimated, since wage information is omitted from the AAP. He also points out that wage information within a job classification will vary and thus any estimation will be subject to "considerable error." Welch also points out that the bids of a successful government contractor are open for inspection to the losers, and he believes that competitors can get a far more accurate assessment of costs this way, than can be obtained by analyzing the employment patterns of a firm as a whole. Welch also believes it is significant that the employment figures refer to the plant as a whole, and cannot be prorated among individual projects, except by using information that is not available in the AAP. He also notes that a project may involve many divisions of Hughes, not just the Culver City division, and that subcontractors may be participating. These factors lead him to conclude that labor costs for any given project simply cannot be estimated from the data contained in the AAP. He observes that "both wages and manpower requirements are necessary, and neither is contained in AAP."

The government's other expert, Flanagan, adds that wages within a job classification vary, and "it is not possible for a competitor with access to the AAP to guess whether wages paid by Hughes are in the upper or lower part of the dispersion."

Surprisingly, Hughes reveals through its witness, Wajda, that it participates in private, industry wide wage and salary surveys which involve "an exchange of information with a select sample of companies in the industry . . ." [1] Wajda notes that "the data includes actual salary ranges, and averages by job classification."

The question remains whether salary ranges and averages are helpful for competitors estimating labor costs, since only certain persons within a job classification may be working on a project.

As Welch and Flanagan point out, different divisions of Hughes might participate in a project, subcontractors may be involved, and manpower needs are still undisclosed.

However this revelation by the plaintiff raises new considerations for this equity court. Weighing heavily in the equitable balance is this apparent collusion between Hughes and its alleged competitors. Hughes' involvement in this cooperative salary survey challenges the claim that Hughes is really worried about its competitive position, should its AAP be disclosed. After studying the AAP, I tend to believe that Hughes is more concerned about embarrassment, should the AAP be made public.

41 CFR § 60–40.3(a)(2) notes that only "those portions of the AAP which constitute information on staffing patterns and pay scales" should be exempt from disclosure, "but only to the extent that their release would injure the business or financial position of the contractor . . `." Hughes has voluntarily released a significant piece of its total labor cost picture, so the concerns of 41 CFR § 60–40.3(a)(2) appear to have been mitigated. Hughes' behavior with its competitors is a strange way of preserving a financial confidentiality it now so strongly seeks to assert.

The Hughes experts also consider other questions besides labor costs, although with less emphasis.

Rutenberg believes that disclosure of data which indicates a turnover of employees might show dissatisfaction with the company, and thus encourage raiding by competitors. However, many inferences can be drawn from such disclosure. It might be an indication of the availability of employment with Hughes. Also, do competitors only raid during signs of dissatisfaction, or is it an ongoing practice? Lastly, the report doesn't indicate which employees are dissatisfied and amenable to raiding.

1. Other companies participating in the salary surveys include: TRW, Honeywell, Magnavox, General Dynamics, Bendix Corp, Lear Siegler, Xerox, McDonald-Douglas, and R. C.A.

Rutenberg also believes that disclosure of a low turnover rate might indicate that the facility is preparing for a major bidding activity. Low turnover, however, might indicate a tight job market, with employees being especially conscious of job security, and thus being unwilling to move on.

Hughes' expert, Kamien, believes that minorities might be discouraged by the Hughes' minority and women employment picture. However as government's expert, Vickery, points out, disclosure of Affirmative Action Plans can serve a search and recruitment purpose, and help companies such as Hughes, comply with the wishes of the government. She believes that informational barriers to job possibilities will be lowered and that the fear of rejection, often held by potential applicants, will be greatly reduced. Women and minority perceptions of the types of jobs open to them will be changed by public release of the AAP and disclosure will also direct these groups to job opportunities.

■ Since many inferences can be drawn from these last three contentions, their possible impact on Hughes' competitive position appears sufficiently diluted, and nondisclosure is not warranted on those bases.

■ The showing presented on the main item of discussion, discovery of Hughes' labor costs, convinces me that disclosure should not be prevented on that basis either.

The government's showing has convinced me of the marginal utility of the Hughes' A.A.P. to a competitor.

Additionally, the revelation of the private, industry wide surveys discredits much of the basis for finding any competitive harm to Hughes, and the apparent collusion is most persuasive for the equitable balancing that must be done in these circumstances. *Theriault* at p. 392.

■ 41 CFR § 60–40.3(a)(2) exempts from disclosure those portions of Affirmative Action Plans which "would constitute a release of confidential financial information of an employee or would constitute an unwarranted invasion of the privacy of an employee." Thus, the following portions of the Hughes Culver City AAP are exempt from disclosure: (1) The entire section designated "Minorities and Females Eligible for Upgrade and Promotion" and (2) "Minorities and Females Possessing College Degrees," etc. (located in Part XII, subsections 7 and 8, as listed in the AAP's Table of Contents). The remainder of the Plan is subject to disclosure.

Judgment is ordered accordingly.