**NATIONAL BROILER COUNCIL, INC., et al., Plaintiffs,**

v.

**FEDERAL LABOR RELATIONS COUN-CIL et al., Defendants.**

**Civ. A. No. 147–74–A.**

United States District Court, E. D. Virginia, Alexandria Division.

April 24, 1974.

John Hardin Young and David Forsyth Zoll, Washington, D. C. (Fred C. Alexander, Jr., Boothe, Prichard & Dudley, Alexandria, Va., James F. Rill, Collier, Shannon, Rill & Edwards, Washington, D. C., L. Alton Denslow, Washington, D. C., Edwin H. Pewett, and Glassie, Pewett, Beebe & Shanks, Washington, D. C., with them on brief), for plaintiffs.

Stephen R. Pickard, Asst. U. S. Atty., E. Dist. of Va., for defendants.

## MEMORANDUM OPINION AND ORDER

ALBERT V. BRYAN, JR., District Judge.

This action contests a decision of the Federal Labor Relations Council (FLRC) holding that the days to be included in the basic workweek for inspectors examining poultry and meat, and the shift starting times for those inspectors, are issues subject to negotiation between the United States Department of Agriculture (USDA) and the union representing the inspectors.

The parties have entered into a stipulated "Statement of Facts" which is attached as an appendix, and which the Court adopts as its findings as to the Industry Background, Basis of Plaintiffs' Claim, Background to Council Decision, Status of Workweek, and Study by Department of Agriculture as these items are set forth in the stipulation.

The entire record before the FLRC is included in Exhibits A–M attached to the affidavit of Michael L. Huggins filed on April 10, 1974.

Defendants have filed a Motion to Dismiss or in the alternative for Summary Judgment. The entire matter was submitted to the Court on the stipulation and argued on the merits as well as the Motion to dismiss on April 17, 1974. The Court will therefore consider the case on the merits rather than on motion.

The complaint asks for injunctive and declaratory relief. The relief afforded by the Administrative Procedure Act, 5 U.S.C. § 706, under which plaintiffs claim, while not couched in those terms, would accomplish the same result should the Court determine to reverse the decision of the FLRC.

The defendants initially interpose as defenses (1) that the decision of the FLRC is not reviewable; and (2) that the action is actually one against the United States which is barred by sovereign immunity. The Court concludes that neither of these bars the present action.

■ The FLRC, though created by Executive Order 11491, 3 C.F.R. 262, is clearly an "agency" within the meaning of 5 U.S.C. § 701(b)(1), and the decision is certainly "final agency action" within 5 U.S.C. § 704. Even if the decision can be treated as concerning a matter committed to agency discretion, still under Littell v. Morton, 445 F.2d 1207 (4th Cir. 1971), the Court should inquire whether there was an abuse of that discretion. Under the standard there announced, the question is whether the decision was "made without a rational explanation, inexplicably departed from established policies, or rested . . . on other 'considerations' that Congress could not have intended to make relevant," id. at 1211 (citations omitted).

■ Related to the argument on nonreviewability is the position of the defendants that because Executive Order 11491 (as amended by Executive Orders 11616 and 11636) does not itself provide for judicial review, none can be had, citing Stevens v. Cary, 483 F.2d 188 (7th Cir. 1973), and Manhattan Bronx Postal Union v. Gronouski, 121 U.S.App.D.C. 321, 350 F.2d 451 (1965). Neither of those cases involved the Administrative Procedure Act or agency decision of the type here sought to be reviewed. Given the presumption in favor of reviewability, see Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and given the views of the Fourth Circuit Court of Appeals in Littell, supra, the Court concludes that the decision here is reviewable under the Administrative Procedure Act.

■ As to sovereign immunity, the court in Littell, supra, rejected the theory of the Administrative Procedure Act as a waiver but, relying on Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), and Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), denied dismissal of the action unless the court's intervention would cause the government to be "stopped in its tracks" or would be a "substantial bothersome interference with the operation of government." Neither of these results is foreseeable here. Obviously USDA, which took the position before FLRC that the issue was non-negotiable, did not feel that such a determination was bothersome to its own operation, and that department has apparently continued its operations uninterruptedly under both interpretations. This is one agency's decision on one relatively isolated aspect of federal employee labor relations.

■ The defendants also contest the standing of plaintiffs to sue. The plaintiffs were not parties to the proceeding before the FLRC. They are, however, clearly parties aggrieved by the decision within the meaning of 5 U.S.C. § 702, since, as will be discussed later, they stand to incur additional non-reimbursa-

ble overtime expense to the inspectors if the FLRC decision is allowed to stand. This is an injury in fact, and the interest sought to be protected is, at least arguably (and more as is pointed out later) within the zone of interest to be protected or regulated by Congress. *See Association of Data Processing Service Organizations v. Camp, supra.*[1]

▉ Failure to participate in the FLRC proceeding likewise is no bar to these plaintiffs. While they were not parties or *amici curiae* in the proceeding before the FLRC, and do not contend that they were unaware of the proceeding, their explanation of this non-participation is sufficient. They point out that the position they assert here was being asserted, adequately they felt, by the USDA before the FLRC, and the regulations promulgated by the USDA as published in the Federal Register (Exhibits A and C) were consistent with the plaintiffs' position on negotiability. Moreover, the plaintiffs had before them the prior decision of FLRC of July 9, 1971, AFGE Local 1940 and Plum Island Animal Disease Laboratory, FLRC No. 71A–11, which, at least on its face, supported the position of USDA.[2] While the last consideration would not, of course, excuse the plaintiffs were they otherwise obligated or had even been invited to appear in the proceedings,[3] it is relevant where the only standing they would have had in any event was as *amici.*

On the merits, the plaintiffs' argument is threefold: *first,* that the decision of the FLRC is contrary to law,

namely, the Poultry Products Inspection Act, 21 U.S.C. § 451 et seq., the Federal Meat Inspection Act, 21 U.S.C. § 601 et seq., the Pay Administration Act, 5 U.S.C. § 5501 et seq., and 7 U.S.C. § 394; *second,* that the decision is contrary to Executive Order 11491; and *third,* that the decision was arbitrary and capricious.

▉ Insofar as the first of these is concerned, the plaintiffs argue that the cited acts give the Secretary of Agriculture exclusive jurisdiction over the poultry and meat inspection programs, a status that is, they say, infringed by the decision of the FLRC. While the acts do give the Secretary broad authority to carry out their purpose [*see,* e. g., 21 U.S.C. § 463(b)], nowhere in the acts is found a grant of exclusiveness to the extent claimed. To say that the Secretary alone may make the kind of decision complained of here is to say that he alone may make *all* decisions with regard to the employees of the Animal and Health Inspection Service of the USDA, a proposition which would render Executive Order 11491 completely inoperative insofar as these employees are concerned. That Executive Order and its predecessor, Executive Order No. 10968, promulgated pursuant to 5 U.S.C. § 7301 (formerly 5 U.S.C. § 631) have been in existence at least since 1962. In 1968 the Poultry Inspection Act was revised and in 1967 the Meat Inspection Act was amended substantially. At neither of these times was any suggestion made that the Secretary's powers were as pervasive as the plaintiffs now contend.

1. The FLRC was, of course, created by the President and not by Congress. That circumstance does not, however, make irrelevant the intent of Congress as to the policies to be observed by USDA in carrying out its inspection responsibilities, as to which see p. 9, *infra.* This is especially so where FLRC's rulings may have substantial effects on USDA's ability to abide by the Congressional intent. Moreover, where the agency is created by the Executive Branch, the Court should look to the zone of interests arguably protected by the executive order, which here includes "the paramount require-

ments of public service," Executive Order 11491, 3 C.F.R. at 262.

2. While the FLRC is not, of course, bound by stare decisis, it is singular that *Plum Island,* seemingly a weaker case for non-negotiability than the instant case, was not even cited by the council in its decision here. See discussion at fn. 5 *infra.*

3. 5 C.F.R. § 2410.6 provides for participation by "interested parties" only "as the Council deems appropriate." The parties here agree that plaintiffs were not invited to participate in the FLRC proceeding.

As an example, while the Poultry Inspection Act is sufficiently detailed to call for the Secretary's fixing of the *rates* of overtime for the type of work here under consideration, 21 U.S.C. § 465, the act is significantly silent as to his fixing of *hours* to be worked. The Court concludes, as did the FLRC, that the mentioned statutes do not preclude FLRC from ruling on the negotiability of workweek and starting times for the inspectors.

■■■ As part of the second of their three arguments the plaintiffs say that Congress could not have intended, when it enacted 5 U.S.C. § 7301, to give the President the authority to contravene the specific authority given the Secretary by 5 U.S.C. § 6101. The latter act directs the Secretary to establish a 40 hour workweek and limits the days over which that workweek may extend. That act is not inconsistent with negotiability of starting times and the basic workweek within the outer limits of its direction to the Secretary. The specific proposal of the union which resulted in the appeal to the FLRC was completely consistent with the Monday through Friday preference indicated in 5 U.S.C. § 6101(a)(3)(B). That of course does not mean that negotiability could not result in an inconsistent proposal; however, construing the decision of the FLRC as allowing negotiability only within the outer limits of 5 U.S.C. § 6101, which the Court does, the decision is not contrary to that law.[4]

■■■ The remainder of the second point of plaintiffs' argument is addressed largely to those parts of Executive Order 11491 which retain to management officials of the USDA the rights "to maintain the efficiency of the

Government operations entrusted to them," § 12(b)(4), and "to determine the methods, means, and personnel by which such operations are to be conducted;" § 12(b)(5). The Court agrees with the treatment given these provisions by the FLRC. Neither right is invaded by negotiation over the starting times and basic workweek of the inspectors. The *plaintiffs'* efficiency or economy may well be affected by overtime expenses resulting from negotiability, but it is hard to conceive of this affecting the efficiency of the USDA. Nor would negotiability as to *when* the inspectors will work seem to limit management ability to determine the methods, means and personnel, as those terms are commonly used, by which the operations of the USDA are conducted.

■■■ Plaintiffs also point to § 11(b) of the Executive Order, which relieves the USDA of the obligation to negotiate on matters with respect to the "mission of [USDA]; its budget; . . . and the numbers, types, and grades of positions or employees assigned to an organizational unit, work project or tour of duty." The Court rejects the argument made by the plaintiffs that negotiability here constitutes negotiating with respect to the mission or budget of the USDA. The Court would also be inclined to reject an argument that it constitutes negotiating with respect to matters concerning the "tour of duty" of employees were it not for the *Plum Island*[5] decision of the Council, where that body unequivocally stated that establishment of new *tours, of the type proposed here,* was *not* negotiable because excluded under § 11(b). In this regard the decision here reviewed is contrary to the FLRC's own interpretation of the Executive Or-

---

4. It is not clear from the decision of the FLRC that this is the construction the Council intended, or that it even considered 5 U.S.C. § 6101. This issue should be met by the FLRC on remand.

5. *Supra,* fn. 1. The defendants argue that the interpretation of the FLRC in the present decision is consistent with its prior

decision in Federal Employees Mutual Trades Council of Charleston and U. S. Naval Supply Center, Charleston, South Carolina, FLRC No. 71a–52. It is difficult to reconcile *Charleston* and *Plum Island,* but it is significant that, at least insofar as the FLRC was concerned, *Charleston* did not overrule *Plum Island.*

der, a factor to be considered in ruling on the plaintiffs' next point.

Plaintiffs' third point, in the Court's view, is meritorious. The clear intent of Congress was that inspection costs should be borne primarily by the United States, with processors bearing a minimal burden both for their own and the public's benefit. *See,* e. g., 1948 U.S. Code Cong.Serv. at 1706–1711. Yet the FLRC wholly fails to consider in its decision the economic impact of negotiability on the inspected establishments. That impact is exemplified by the effect of the negotiated agreement now in effect which will, the uncontradicted evidence shows, increase the amount of unreimbursable overtime to be paid by those establishments.

The Council's opinion fails to take into account the obvious circumstance that this is not the garden-variety contract between an agency and its employees. Although these are federal employees, and effectuate a federal government policy, they do so within the business operations of private interests. Those interests are completely dependent upon the presence of the inspectors, since meat and poultry in order to be legally saleable must be processed in the presence of an inspector at every stage. The exigencies of the meat and poultry industry, including the odd hours necessarily kept by some processors, should at least be considered in determining negotiability, since the very fact of negotiability of workweek and starting time makes it more than likely that there will be an economic impact on some processors. It may be expected, as the facts

here confirm, that the union will win some concessions as to these issues, and some processors will be affected.

This is not to say that the time issues cannot be held negotiable, but only that the FLRC should seriously weigh the impact of negotiability on the interests most likely to suffer direct adverse effects before reaching its decision.

The FLRC in its opinion refers to earlier language in *Charleston* in which the Council opined that management, in determining negotiability in the context of efficiency, should balance a variety of factors. The applicability of that test may not be affected by the fact that industry will pay the overtime. However, given the FLRC's (and the Court's) conclusion that § 12(b)(4) does not *per se* make an issue non-negotiable, the FLRC here has ignored the possibility that the factors and their balance will be entirely different where private industry (a) has to pay part of the costs while (b) having little or no voice and absolutely no power in any negotiating process. The FLRC dismisses the Department's argument on this point [6] with the statement that § 12(b)(4) does not make the distinction. This not only fails to answer the argument, but also is irrelevant given the facts of this case. The FLRC seems not to have considerd even the meager statistical data submitted by the Department.

The inadequacy of the FLRC's analysis is further demonstrated by the statement on p. 3 of its opinion that:

Nothing in the language of the union proposal would require the payment of overtime to the inspectors before the

---

**6.** As pointed out by the USDA in its position before the FLRC here, in discussing *Charleston:*

The issue there involved the question of negotiability of the basic workweek between the union and management in respect to appropriated fund employees whose jobs are *not service oriented to an industry in the private sector.* The Meat and Poultry Inspection Program, however, is performing a service to the public and the industry in which the Program's operational function (hours) has a *definite impact on industry and commerce.* In pro-

viding this protection to the consumer, we must remain cognizant of the rights of the owners and operators of the plants in which we regulate their operations. In the Charleston case, any compensable overtime was paid from appropriated funds. This is not so in this case where overtime *is reimbursable through charges* made to the plants inspected, which places the overtime cost burden on industry in the private sector.

Exhibit "H" to Huggins' Affidavit, at p. 2 (emphasis supplied). See also *id.* at pp. 5–7.

statutory minimums [8 hours per day, 40 hours per week] have been met.

This statement suggests that the Council was confusing negotiability *per se,* the issue then before it, with the specific proposal submitted by the union for negotiation. Furthermore, it is completely at odds with the statement in the Huggins affidavit (at p. 5) that:

> Any time worked by the inspector which . . . is outside the days and times agreed upon, constitutes overtime work and the inspector is compensated at premium rates.

Which statement is correct is not really in issue, but Huggins is in accord with typical practice and with the stipulation of the parties here. It seems that the FLRC's resolution of this did not take into account the relevant evidence on this most important question.

The FLRC did not have the benefit of the survey in evidence here, so that it really had no idea what the impact of its decision would be. The FLRC never mentioned impact, except to say that the USDA should have considered it. That, as stated, is the central problem with the Council's action here. However even if, as the survey suggests, relatively few processors will be adversely affected, that impact must still be considered. Negotiability obviously will have little effect on processors who keep fairly traditional hours, or who are so large that they can absorb the increased expense. It is the small operators who must work at night, or on Saturdays, or who may need to from season to season as markets fluctuate, who may be injured. Negotiability also means little to the inspectors who work at the large plants or at those keeping "normal" hours. They already have the hours or the premium rates for which the others want to negotiate. Thus, the only possible major impact is on the relatively few whom negotiability would affect, and the impact on those operations is most significant in determining whether as a matter of policy these issues should be negotiable.

Accordingly, for failure to make a rational explanation of its decision as heretofore pointed out, for inexplicably departing from its previous policies as exemplified in the *Plum Island* decision, and for failure to consider matters that Congress clearly intended to make relevant, the Court concludes that there has been an abuse of discretion within the meaning of Littell v. Morton, *supra.* The decision of the FLRC must therefore be reversed.

Rather than render the decision finally, however, the Court feels that the deciding agency first ought to reconsider its own decision—to apply its special expertise in these matters. Accordingly the decision of the FLRC will be reversed, and the case remanded to that body for consideration in a manner consistent with this opinion.

And it is so ordered.

## APPENDIX

## STATEMENT OF FACTS

Come now Attorneys for Plaintiffs and Defendants by mutual consent to agree to the following Stipulated Statement of Facts.

## A. INDUSTRY BACKGROUND

This action was instituted by the National Broiler Council and a number of state and regional poultry associations, along with the National Independent Meat Packers Association and a number of state and regional meat packers associations. Shortly thereafter, the National Turkey Federation joined the lawsuit along with additional state and regional poultry associations.

Plaintiffs are all incorporated or unincorporated trade associations, representing slaughterers and processors of poultry and meat subject to inspection by the United States Department of Agriculture under the Poultry Products Inspection Act, 21 U.S.C. §§ 451–470 (1973) and the Federal Meat Inspection Act, 21 U.S.C. §§ 601–695 (1973). Each plaintiff association has for a number of years represented its members with re-

spect to issues arising under these statutes. In this connection, they have advised members of inspection-related developments at the Department of Agriculture, presented the views of members concerning Departmental proposed rules and regulations, and taken up members' problems with the Department.

The operations and starting times of poultry and meat slaughtering plants are dependent upon geographical, climatic, seasonal, economic and market conditions, and upon whether they operate one or more shifts, whether they are slaughter or processing plants, and the type of livestock or poultry being slaughtered or processed, and shipping schedules.

Prior to the actual killing of the birds, the poultry slaughterers must catch and crate the poultry at night, when the birds, more docile than in daylight hours, are easier to collect and less likely to be killed or injured in the catching process. Poultry killed at times other than during an inspected slaughtering process cannot be sold by the processor. Injured birds must have injured parts removed before they can continue through plant operations. Moreover, poultry must be caught and slaughtered at the coolest time of day in order to prevent weight loss from dehydration and death caused by heat and suffocation of caged birds. Poultry processors may start slaughtering and processing as early as 3:00 a. m. with some starting as early as 12:00 a. m. Slaughtering begins by the unloading and killing of the poultry which must be accomplished as soon as possible after poultry is caged. The longer the delay between catching and slaughter the greater the loss to the processor. The poultry is then de-feathered, eviscerated, cut into sections, packaged and shipped for same-day delivery to distant markets. Obviously, the longer the delay between slaughter and ultimate sale to the consumer, the greater the danger of spoilage.

Meat slaughterers, after receiving livestock, must slaughter the animals and clean, dress and cut the carcass. All of these operations are subject to inspection. The days of the workweek for slaughterers depend upon market demand, supply schedules, space in holding pens, and short-term supplies and demands. For instance, due to weather conditions, transportation delays and the like, over which the meat slaughterer has no control, there are occasions when the slaughterer is not able to receive timely delivery of livestock.

Retailers traditionally receive beef and pork from slaughterers on Monday and Wednesdays and occasionally on Thursdays.

Meat packers have been negotiating with USDA for over a year to have the workweek set as any five consecutive days from Monday through Saturday. Unlike poultry slaughterers, meat slaughterers typically do not own the animals prior to slaughter. Therefore, these meat slaughterers have no control over the supply of animals prior to delivery to slaughter plants.

Poultry and meat processing and packing are highly competitive businesses. Plants tend to locate where production and processing costs are lowest. For example, meat slaughter and processing plants are predominantly located near producing areas. Livestock is raised and slaughtered primarily in the midwestern states for sale in markets throughout the United States. Poultry is produced and processed primarily in the so-called "broiler belt" which extends from East Texas to the Delaware-Maryland-Virginia peninsula and embraces the States of Arkansas, Mississippi, Alabama, Georgia, Tennessee, South Carolina, North Carolina and Virginia. Maine and the northeastern United States are also important poultry producing areas, as is the Pacific Coast. It is readily apparent, in view of the geographical concentration of the industry, that the preponderance of products must be shipped great distances to markets in the major metropolitan areas. It is also apparent that producers and processors are located in areas of extreme

climatic conditions. This specifically impacts upon the poultry industry which operates in the hotter regions of the United States.

## B. BASIS OF PLAINTIFFS' CLAIM AND DEFENDANTS' MOTION TO DISMISS

Plaintiffs' action is against the Federal Labor Relations Council (herein the Council) and its chairman and members. Included as defendants are Earl Butz, Secretary of the Department of Agriculture (herein the Department) and Francis Mulhern, Administrator of the Animal and Plant Health Inspection Service of the Department.

Plaintiffs' action seeks injunctive and declaratory relief against defendants from enforcing or implementing or taking any action pursuant to Council Decision 73A–36 which held that both the days to be included in the basic workweek for inspectors examining poultry and meat and the shift starting times for those inspectors are issues subject to negotiation between the United States Department of Agriculture ("USDA") and the union representing its inspectors; and to enjoin the Secretary of Agriculture and the Administrator of the Animal and Plant Health Inspection Service from negotiating with the inspectors' unions, the basic workweek or shift starting times.

Essentially, this is an action to enjoin the Department from taking any action pursuant to the Council decision holding that the Secretary of Agriculture's determination of workweeks and starting times was a determination which was negotiable with the inspectors' unions. The Secretary of Agriculture, pursuant to the Council decision, has entered into an agreement with the inspectors' union which sets the workweek for food inspectors of slaughter plants, both for meat and poultry, to be on a Monday through Friday schedule, and which sets the starting times for food inspectors of slaughter plants, both for meat and poultry, to begin no earlier than 4:00 a. m. and terminate no later than 6:00 a. m.

as to single shift plants. Multiple shift plants would have the same workweek, but the time schedule requires the first shift to conform to the single shift slaughter plant schedule and the second shift to start prior to 6:00 p. m.

Moreover, the plaintiffs request that the Court declare the decision of the Council to be arbitrary, capricious and unlawful.

After this action was filed, the Court set the matter for a hearing on April 17, 1974. The parties agreed to have the matter heard as a consolidation of both the preliminary and permanent injunction.

In response to the plaintiffs' action, the defendants have filed a Motion to Dismiss or in the alternative a request for Summary Judgment along with its Answer.

## C. RELEVANT STATUTES AND ORDERS

The relevant statutes involved in this action are the Poultry Products Inspection Act, 21 U.S.C. §§ 451–470 (1973), the Federal Meat Inspection Act, 21 U. S.C. §§ 601–695 (1973), the Pay Administration Act, 5 U.S.C. §§ 5501 et seq., (1973), 7 U.S.C. § 394 (1973), and the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1973).

This action also involves the interpretation of Executive Order 11491, October 29, 1969, as amended by Executive Order 11616, August 26, 1971, and Executive Order 11636, December 17, 1971, (Order) issued pursuant to 5 U.S.C. § 3301 and 5 U.S.C. § 7301 (1973) establishing the Federal Labor Relations Council (Council). Composition of the Council includes the Chairman of the Civil Section Commission, the Secretary of Labor, and the Director of the Office of Management and Budget.

## D. BACKGROUND TO COUNCIL DECISION

In August of 1968, the meat and poultry inspection programs merged, in an effort to economize inspection manpow-

er. While all inspectors in the meat and poultry programs do not work side by side in the various plants, they perform the same basic function. One of the major differences in the two programs involved the method and times inspector services were provided to industry and the amount of overtime which was to be charged.

From January 1972 through November 1972, consultations were held between the Department and the AFGE in order to solicit views and exchange ideas. As a result, several changes were made in the docket.

On December 12, 1972, proposed regulations were published in the Federal Register reflecting the regulatory changes and including provision for a workweek consisting of any five consecutive days, Monday through Saturday. A sixty-day comment period, extended for an additional thirty days, was provided by the regulations. Approximately 174 written comments were received by the Department from many sources, including members of the poultry and meat industries.

Around March 15, 1973, the union submitted their contract proposals to the Department. The Department, in its counter-proposals, took the position that the union's proposed of basic workweek was non-negotiable.

During May 1973, negotiations were held by the Department with the union. No agreement on the workweek and tour of duty for slaughter inspectors was reached. Thereafter, on June 29, 1973, the AFGE presented their position to the Department for a formal determination. In response the Department held the workweek and tour of duty was non-negotiable.

On August 2, 1973, the AFGE filed their appeal to the Council. The Department responded on August 20, 1973, and on December 27, 1973 the Council rendered the decision which is contested here.

### E. STATUS OF WORKWEEK AND TOUR OF DUTY AGREEMENT

Subsequent to the Council's decision, the Department entered into a contract clause which included the unions' demands on a Monday through Friday workweek and a tour of duty starting no earlier than 4:00 a. m. and terminating no later than 6:00 p. m., with the second shift commencing no later than 6:00 p. m.

### F. STUDY BY DEPARTMENT OF AGRICULTURE AS TO IMPACT

Subsequent to the Council's decision on negotiability, the Animal and Plant Health Inspection Service of the Department conducted a telephone survey of current plant workweeks and tours of duty by surveying selective field personnel. The results of that study are attached to Defendants' Answer as the first four pages of Exhibit M.

Agreed this 16th day of April 1974.