*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0208p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TRANSAMERICA ASSURANCE CORPORATION,
                                    *Plaintiff,*

               *v.*

SETTLEMENT CAPITAL CORPORATION,
                          *Defendant-Appellant,*

UNITED STATES OF AMERICA,
                          *Defendant-Appellee,*

GARY STEELE,
                                  *Defendant.*

No. 06-5601

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 05-00126—John G. Heyburn II, Chief District Judge.

Argued: March 16, 2007

Decided and Filed: June 5, 2007

Before: COOK and McKEAGUE, Circuit Judges; and EDGAR, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Robert B. Weathersby, ANDREWS KURTH, Dallas, Texas, for Appellant. William G. Cole, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Robert B. Weathersby, Suzanne B. Campbell, ANDREWS KURTH, Dallas, Texas, Frank P. Doheny, Jr., DINSMORE & SHOHL, Louisville, Kentucky, for Appellant. William G. Cole, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Nathaniel R. Jones, Sharon J. Zealey, BLANK ROME, Cincinnati, Ohio, for Amicus Curiae.

---

[*] The Honorable R. Allan Edgar, Senior United States District Judge for the Eastern District of Tennessee, sitting by designation.

1

———————————

**OPINION**

———————————

COOK, Circuit Judge.  Settlement Capital Corporation ("Settlement Capital") appeals a district court's order granting summary judgment in favor of the United States on the basis of federal sovereign immunity.  We affirm.

I

Gary Steele was injured by a Virginia National Guard vehicle.  He filed a claim against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671, *et seq.*  The United States settled the claim by purchasing an annuity for Steele's benefit from TransAmerica Assurance Corporation ("TransAmerica").  According to its contract with TransAmerica, the United States owns the annuity and retains "the right at any time to designate to whom annuity payments will be made."  Steele has been receiving, and is set to receive, various periodic and lump-sum payments under the annuity.

Facing urgent business expenses and needing to finance his daughter's wedding, Steele sought to convey $37,453.53 in anticipated annuity payments to Settlement Capital in exchange for a lump-sum payment of $18,250.  To this end and to comply with Florida law regulating the transfer of structured-settlement payment rights, Steele presented his agreement with Settlement Capital for review by the Eleventh Judicial Circuit Court of Miami-Dade County (FL).  *See* Fla. Stat. § 626.99296 (hereinafter "Florida Transfer Act").  The Florida Transfer Act requires that notice of the proposed transfer be sent to "interested parties," so Settlement Capital sent notice to both TransAmerica (as "annuity issuer") and the United States (as "structured settlement obligor").  *See* Fla. Stat. § 626.99296(2)(i), (3)(a)(5), (4).

Having received no objection to the proposed transfer from either TransAmerica or the United States, the Florida court issued an order approving the transaction.  The next day, Settlement Capital wrote to inform TransAmerica of the Florida court's order and to ask that Settlement Capital be designated the payee of record for future annuity payments.  The following day, an attorney from the U.S. Department of Justice wrote to the Florida court explaining that while the United States neither intended to appear in the (already-concluded) transfer proceeding nor consented to the Florida court's jurisdiction, it believed the Florida court lacked jurisdiction to enter a structured-settlement transfer order "attempting to alter the United States' contract rights with both Gary Steele and TransAmerica Assurance Company."  That is, the United States claims it would alter an alleged anti-assignment provision in the Steele–United States settlement contract, as well as the language in the TransAmerica–United States annuity contract giving the United States the right to designate the annuity payee.  The United States also sent a letter directing TransAmerica not to change the annuity payee.

Settlement Capital paid Steele the agreed-upon lump sum, but TransAmerica hesitated to forward annuity payments to Settlement Capital because of the United States' opposition.  Settlement Capital urged TransAmerica to comply with the Florida order, noting that despite similar form-letter opposition from the United States, annuity issuers have often acceded to structured-settlement transfers without incident, even when the United States owned the annuity.  TransAmerica ultimately filed an interpleader action naming the United States, Settlement Capital, and Gary Steele as defendants and asking the district court to adjudicate the competing claims to the annuity payments.  *See* 28 U.S.C. §§ 1335, 2361.  The parties moved for summary judgment, and the district court ordered, in relevant part, (1) that the United States' motion for summary judgment was granted and Settlement Capital's motion for summary judgment was denied; (2) that the Florida court's order was "void, as having been entered without jurisdiction and without a waiver of the

United States of America's sovereign immunity"; and (3) that TransAmerica should continue to make annuity payments to Steele unless the United States (as annuity owner) directed otherwise. Settlement Capital appealed the district court's conclusion that federal sovereign immunity applies.

II

This case turns on whether the doctrine of federal sovereign immunity deprives a state court of jurisdiction to approve a transfer of structured-settlement payment rights where the United States nominally owns—but has no beneficial interest in—the annuity funding these payments. If federal sovereign immunity applies, summary judgment should be granted in favor of the government. *Cf. Akers v. Alvey*, 338 F.3d 491, 497 (6th Cir. 2003). This court reviews de novo the district court's grant of summary judgment and resolution of legal questions, but accepts the district court's factual findings unless clearly erroneous. *Cf. S.J. v. Hamilton County*, 374 F.3d 416, 418 (6th Cir. 2004).

III

Tort damages have traditionally been paid on a lump-sum basis. The structured settlement, often involving periodic payments over a long term, evolved as a way to foreclose a tort victim from improvidently exhausting his award.[1] The federal tax characterization of a tort award matters both to the victim and to the obligor. Although lump-sum tort-settlement payments have always been excluded from the victim's income, *see* 26 U.S.C. § 104, the tax treatment of a structured-settlement award was once uncertain. Tort victims' periodic annuity payments received from a structured settlement, for example, might formerly have been included in the victim's income, even though clearly part of a tort settlement. In the late 1970s, the Internal Revenue Service (IRS) issued several rulings suggesting that tort-settlement periodic payments would be excluded from the victim's income as long as the victim could not control or accelerate the payments. A 1982 amendment to 26 U.S.C. § 104 and enactment of 26 U.S.C. § 130 clarified the tax treatment of structured settlements and revealed their potential advantages. Section 130 allows tort obligors to fund their obligations via an annuity and excludes these payments from the payee's income as long as (among other things) the payments are "fixed and determinable as to amount and time of payment" and "cannot be accelerated, deferred, increased, or decreased by the recipient." 26 U.S.C. § 130(c).

In response to victims' desire to liquidate such periodic-payment rights, a market developed where companies purchase a tort victim's rights to future payments in exchange for a lump sum. This business of liquidating anticipated structured-settlement payments is known as "factoring," and the firms engaged in it as "factors." But the industry faced a problem in the possibility of factored structured-settlement payments being deemed "accelerated," no longer being deemed "fixed and determinable," and accordingly being denied the favorable tax treatment otherwise accorded tort settlement proceeds. That is, factoring, it was feared, might disqualify payments from being excluded either from the payee's income under § 130 or from the factor's income (since the factor is not a tort claimant under § 104). But new legislation prescribing a method to accomplish a factoring transaction while retaining favorable tax treatment essentially eliminated this possibility. The Victims of Terrorism Tax Relief Act of 2001, Pub. L. No. 107-134, § 115 (2002), added § 5891 to Title 26 to govern the tax treatment of structured-settlement factoring transactions. It imposes a stiff excise tax on anyone acquiring structured-settlement payment rights in a factoring transaction, 26 U.S.C. § 5891(a), but then excepts from this tax any factoring transaction "approved in advance in a qualified order," *id.* § 5891(b)(1). Approval essentially turns on a finding that the transaction is in the best interest of the payee and is not contrary to law or court order, *see id.* § 5891(b)(2)(A), and a "qualified order" may be issued "under the authority of an applicable State statute by an

---

[1] For background information on structured settlements, see generally Adam F. Scales, *Against Settlement Factoring? The Market in Tort Claims Has Arrived*, 2002 Wis. L. Rev. 859.

applicable State court," *id.* § 5891(b)(2)(B)(i). To support this scheme, states have passed statutes regulating the transfer of structured-settlement payments and empowering state courts to conduct transfer proceedings and issue orders that comply with federal tax law. The Florida Transfer Act is one such statute. The issue posed here concerns the intersection of federal sovereign immunity principles and such implementing state statutes.

IV

Settlement Capital first argues that under the relevant Supreme Court precedent, federal sovereign immunity does not deprive the Florida state court of jurisdiction to issue an order directing the United States to redesignate the payee of the annuity in question. It invokes the Supreme Court's decision in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949), as its starting point for this argument. *See Malone v. Bowdoin*, 369 U.S. 643, 646 (1962) (explaining that *Larson* marks the beginning of the modern doctrine of federal sovereign immunity). *Larson*, as with most cases on federal sovereign immunity, required determining whether a suit nominally against a government officer was actually a suit against the government. In this case, however, the connection between the federal government and Steele's petition in Florida court is more attenuated: no one affiliated with the federal government was a party to the Florida transfer action. Nonetheless, *Larson* provides the framework to determine whether the transaction at bar implicates the doctrine.

*Larson* held that a suit brought by the Domestic and Foreign Commerce Corporation against the head of the War Assets Administration to enforce an alleged contractual right to purchase coal was barred by federal sovereign immunity. 337 U.S. at 684, 703. The *Larson* Court advised that to determine whether an action implicates federal sovereign immunity as a suit against the government, "the denomination of the party defendant" is not the proper test—instead, "the crucial question is whether the relief sought in a suit nominally addressed to the officer is relief against the sovereign." *Id.* at 687. If the suit "will not require action by the sovereign or disturb the sovereign's property," there is "no jurisdictional difficulty." *Id.* On the other hand, a suit nominally directed at an officer, but seeking judicial "compulsion against the sovereign," is barred. *Id.* at 688.[2] The Court reasoned that federal sovereign immunity is justified as a policy matter because the government "cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right." *Id.* at 704.[3]

Later Supreme Court cases adhere to the *Larson* formulation in officer suits, *see, e.g.*, *Malone*, 369 U.S. at 646–48, but the Court also has invoked another test for determining whether an action seeks "compulsion against the sovereign." In *Dugan v. Rank*, various plaintiffs claiming water rights in the San Joaquin River sued (among others) officials of the U.S. Bureau of Reclamations. 372 U.S. 609, 610 (1963). The Supreme Court invoked *Larson* "and other cases in the field of sovereign immunity," *id.* at 620, to hold that the doctrine barred entry of an order enjoining these officials from diverting water from the San Joaquin, *id.* at 621. Although the Court relied in part on *Larson*, it began with "the general rule . . . that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration.'" *Id.* at 620 (quoting *Land v. Dollar*, 330 U.S. 731, 738 (1947)).

---

[2] *Larson* also articulated two circumstances, not relevant here, where an officer suit requesting specific relief would not implicate sovereign immunity: (1) where the officer's actions are *ultra vires*, and (2) where the officer's actions, though within his official authority, are claimed to be unconstitutional. *See* 337 U.S. at 689–90, 701–02.

[3] Settlement Capital misreads *Larson*'s statement that the government "cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right." 337 U.S. at 704. Settlement Capital takes this language to mean that the government must be "stopped in its tracks" before federal sovereign immunity applies. This is not the proper reading. Under *Larson*, stopping the government in its tracks is sufficient, but not necessary, to trigger federal sovereign immunity. Lesser interferences too may suffice.

Settlement Capital directs us to certain lower-court cases that craft a less demanding formulation while purporting to follow Supreme Court precedent. In *Littell v. Morton*, the plaintiff "sought judicial review by mandamus of a determination of a previous Secretary of the Interior disallowing his claims for compensation for professional services rendered to the [Navajo] Tribe." 445 F.2d 1207, 1209 (4th Cir. 1971). Although it acknowledged that the plaintiff was "seeking to compel the Secretary to act," *id.* at 1213, such that federal sovereign immunity would generally bar the suit, the Fourth Circuit invoked "the underlying policies of the doctrine" to reverse the district court's decision that the suit was barred, *id.* at 1214. In doing so, the court announced that "[t]he rationale for sovereign immunity essentially boils down to substantial bothersome interference with the operation of government." *Id.*[4] Because the government would not be "'stopped in its tracks,'" the doctrine did not bar this suit.[5] *See id.* (quoting *Larson*, 337 U.S. at 704). The Fourth Circuit soon thereafter reaffirmed this aspect of *Littell*,[6] but the "substantial bothersome interference" formulation has since received little attention,[7] and we decline to follow it.

The question, then, is whether the circumstances of this case implicate sovereign immunity under the formulations of *Larson* and *Land v. Dollar*. That is, does a state-court decision ordering the federal government to direct TransAmerica to change the annuity payee from Steele to Settlement Capital compel or require action from the sovereign, *Larson*, 337 U.S. at 687–88, or "expend itself on the public treasury or domain, or interfere with the public administration"? *Land v. Dollar*, 330 U.S. at 738. We decide it does both. Although a single instance of compelling the government to file paperwork might seem trifling, the core administrative concern, *see Land v. Dollar*, 330 U.S. at 738, is national in scale, and under the plain language of *Larson*, compulsion itself is the vice that implicates federal sovereign immunity.[8]

Settlement Capital insists it should prevail by arguing that "ministerial" acts—even if compelled—do not implicate federal sovereign immunity. *See, e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 110 & n.20 (1984) (recognizing that federal sovereign immunity does not apply to suits challenging an official's performance of his ministerial duties, but does apply to suits challenging performance of duties involving discretion). Settlement Capital misreads the cases on ministerial acts by construing the word "ministerial" to mean simply "trivial" or "easily accomplished." In the sovereign immunity context, a ministerial action is one that the official has

---

[4] In our judgment, the *Littell* court misread *Larson* the same way Settlement Capital now does. *See supra* note 3.

[5] *Littell*'s terminology is as confusing as its logic. The court said the doctrine of federal sovereign immunity "is applicable," 445 F.2d at 1213, but still concluded that it did not "require dismissal of this suit," *id.* at 1214, even though neither of the two *Larson* exceptions (*supra* note 2) applied, *id.* at 1213–14. In our judgment, this is just another way of saying that federal sovereign immunity does *not* apply.

[6] *See Westinghouse Elec. Corp. v. Schlesinger*, 542 F.2d 1190, 1208 n.59 (4th Cir. 1976), *superseded on other grounds by* 5 U.S.C. § 552b.

[7] Few other federal cases—none from an appellate court and none less than thirty years old—have applied the "substantial bothersome interference" test. *Hsing v. Usery*, 419 F. Supp. 1066, 1070 (W.D. Pa. 1976); *Phillips v. Dawson*, 393 F. Supp. 360, 365 (W.D. Ky. 1975); *Nat'l Broiler Council, Inc. v. Fed. Labor Relations Council*, 382 F. Supp. 322, 325 (E.D. Va. 1974); *Mount Sinai Hosp. of Greater Miami, Inc. v. Weinberger*, 376 F. Supp. 1099, 1115 (S.D. Fla. 1974); *White v. Bloomberg*, 345 F. Supp. 133, 141–42 (D. Md. 1972).

[8] For this reason, Settlement Capital's reliance on *Gao v. Jenifer*, 185 F.3d 548 (6th Cir. 1999), is misplaced—in that case, the state court's decree "d[id] not, in itself, restrain or compel the government." *See id.* at 554.

a legal duty to perform, as opposed to one he has discretion to perform or not. *See, e.g.*, *id.*[9] Settlement Capital identifies no legal duty on the part of the federal government or any federal official to redesignate the payee on the annuity in question, so the ministerial-acts exception is unavailing.

V

Settlement Capital has a second argument why federal sovereign immunity should not apply. Stated syllogistically, Settlement Capital argues that federal sovereign immunity is just a matter of federal common law, and federal common law only applies when there is a federal interest at stake; there is no federal interest here, so state law (i.e., the Florida Transfer Act) should govern. Without suggesting that courts need to undertake such an "interest analysis" in any case where the federal government asserts sovereign immunity, we address Settlement Capital's argument to demonstrate that it fails on its own premises.

The first premise is that federal sovereign immunity is a matter of federal common law. This principle is, at a minimum, debatable.[10]  The second premise is that federal common law does not apply (i.e., displace state law) when there is no federal interest at stake. *See, e.g.*, *Miree v. DeKalb County*, 433 U.S. 25 (1977). Regardless whether this second premise holds as a general proposition, because we conclude that a federal interest *is* at stake in this case, Settlement Capital's argument collapses.

Settlement Capital argues that there is no federal interest at stake here because in passing the Victims of Terrorism Tax Relief Act of 2001, in particular 26 U.S.C. § 5891, Congress blessed the practice of factoring structured settlements without regard to the identity of the annuity owner (be it the government or a private party). Its argument, however, obscures the true nature of its asserted entitlement. Settlement Capital essentially claims rights as a purported assignee of the annuity contract between Steele and the United States. Contract claims against the government fall within the purview of the Tucker Act, 28 U.S.C. §§ 1346, 1491, and because the value of the claim in this case exceeds $10,000, the Court of Federal Claims has exclusive jurisdiction.[11]  Therefore, the

---

[9] *See also Houston v. Ormes*, 252 U.S. 469, 472 (1920) (deeming federal sovereign immunity inapplicable because "the fund in question has been appropriated by act of Congress for payment to a specified person" and "the officials of the Treasury are charged with the ministerial duty to make payment on demand to the person designated"); *Minnesota v. Hitchcock*, 185 U.S. 373, 386 (1902) (noting that federal sovereign immunity is not implicated when "officers of the United States are sued, in appropriate form, to compel them to perform some ministerial duty imposed upon them by law, and which they wrongfully neglect or refuse to perform").

[10] *See generally, e.g.*, Erwin Chemerinsky, *Federal Jurisdiction* § 9.2.1, at 610–14 (4th ed. 2003); Richard H. Fallon, Jr., Daniel J. Meltzer & David L. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* ch. IX(B), at 944–45 (5th ed. 2003).

[11] Section 1346(a)(2) provides that "[t]he district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of . . . claim[s] against the United States, *not exceeding $10,000 in amount*, founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2) (emphasis added). Section 1491(a)(1) provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." "Because the district court's jurisdiction under section 1346(a)(2) is limited to claims under $10,000, while that of the Claims Court is not, most federal courts have stated that the Claims Court's jurisdiction over non-tort claims against the government in excess of $10,000 is exclusive." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 n.8 (D.C. Cir. 1985). That Settlement Capital is a purported assignee of, rather than a party to, the annuity contract matters not because unless statutory law provides otherwise, "the Tucker Act must be read to waive sovereign immunity for assignees as well as those holding the original claim." *See Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1375 (Fed. Cir. 2001).

federal interest at stake here is in having claims resolved in the forum contemplated by Congress.[12] To say that the Court of Federal Claims is the appropriate forum for Settlement Capital to assert its entitlement is not to say either that the district court here lacked its usual interpleader jurisdiction, 28 U.S.C. §§ 1335, 2361, or that this court lacked its typical appellate jurisdiction, 28 U.S.C. § 1291. We simply note that the contractual entitlement Settlement Capital asserted in the interpleader action below is an entitlement cognizable only in the Court of Federal Claims. Put another way, Settlement Capital cannot use the fortuity of being named in an interpleader action to assert in district court an entitlement it would otherwise need to assert in the Court of Federal Claims.

## VI

While a state court may find that a proposed structured-settlement factoring transaction would be in the best interests of the payee, it cannot compel or require non-ministerial action on the part of the federal government, absent a waiver of sovereign immunity. *See Larson*, 337 U.S. at 687–88. For the reasons stated above, we affirm.

---

[12] *See, e.g.*, *West v. Gibson*, 527 U.S. 212, 226 (1999) (Kennedy, J., dissenting) (citing *Case v. Terrell*, 78 U.S. 199 (1870), for the proposition that "[t]he United States' consent to suit in the Court of Claims does not extend to other federal courts"); *United States v. Shaw*, 309 U.S. 495, 501 (1940) (citing *Minnesota v. United States*, 305 U.S. 382, 388 (1939), for the proposition that "[e]ven when suits [against the federal government] are authorized they must be brought only in designated courts"); *Minnesota*, 305 U.S. at 388 ("[I]t rests with Congress to determine not only whether the United States may be sued, but in what courts the suit may be brought."); *McElrath v. United States*, 102 U.S. 426, 440 (1880) ("The [federal] government cannot be sued, except with its own consent. It can declare in what court it may be sued, and . . . may restrict the jurisdiction of the court to a consideration of only certain classes of claims against the United States.").