Norma **SELTZER** and Margarita Torres–Cartagena, Plaintiffs,

v.

William E. **FOLEY** et al., Defendants.

**80 Civ. 6496(MP).**

United States District Court, S. D. New York.

Dec. 8, 1980.

Buchwald & Kaufman, New York City by Don D. Buchwald, New York City, for plaintiffs.

John S. Martin, Jr., U. S. Atty., S. D. N. Y. by William Hibsher, Asst. U. S. Atty., New York City, for defendants.

MILTON POLLACK, District Judge.

The plaintiffs seek a declaratory judgment and an injunction against the Director of the Administrative Office of the United States Courts to prevent him from certifying Spanish/English interpreters for the United States Courts on the basis of the written examinations he utilizes to determine the qualifications of applicants for such certification. The nub of plaintiffs' claim is that the examination administered, tests applicants on language proficiency unrelated to anything encountered normally in a courtroom by bilingual interpreters, uses inaccurate and invalid criteria and fails to take into consideration the statutory obligation to consider "education, training and experience". Plaintiffs, two independent consultants, who have for many years performed Spanish/English interpreting services to the satisfaction of judges and lawyers, have taken the written examination twice and failed to pass it.

An application for a temporary restraining order was denied on November 14, 1978 and a hearing for a preliminary injunction as well as a trial of the merits has been held.[1] The Director presented evidence which established that the test was soundly formulated by experts, suitable for the statutory purposes sought to be achieved and rationally related thereto and fairly administered; that in carrying out his statutory mandate under the Court Interpreters Act of 1978, 28 U.S.C. § 1827, *et seq.*, his procedure was neither arbitrary nor capricious.

At the conclusion of the hearing and trial, the Court made basic findings of fact pursuant to Rule 52(a) on the substance of the claims and denied the requested injunction and ordered the complaint to be dismissed and judgment entered pursuant to Rule 58, leaving it to a later supplement and opinion to be filed to deal with other matters.

*Jurisdiction*

At the threshold, the Director moved to dismiss this suit for lack of subject matter and personal jurisdiction. The relief sought herein is neither certification nor money damages, but only a declaration that the Director's actions have not comported with the statute, an injunction undoing the certifications made to date under the examinations conducted and a mandatory injunction to establish a new certification program in conformity with the Act.

■ Judicial immunity and sovereign immunity urged by the government against proceeding with this suit, appear to be inapplicable concepts here. There is no real interference with or questioning of any judicial function or act. Moreover, even as to judges, it has been held in numerous cases, that immunity does not extend to injunctive relief. *Person v. Association of the Bar of the City of New York*, 554 F.2d 534, 537 (2d Cir. 1977). Sovereign immunity has two exceptions which could apply in this case if the terms of the complaint could be factually sustained. "Those exceptions are (1) action by officers beyond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void." *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1962).

■ Plaintiffs' allegations in the complaint that a government official had acted unconstitutionally to deprive them of a liberty interest and of procedural due process, thereby raised a substantial federal question within the subject matter jurisdiction of the federal courts. 28 U.S.C. § 1331

---

1. Pursuant to Fed.R.Civ.P. 65(a)(2) the Court ordered the trial of the action on the merits to be advanced and consolidated with the hearing of the application.

(Supp.1980); *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).[2]

The government further contended that there is an absence of personal jurisdiction over the Director and that 28 U.S.C. § 1391(e) does not avail plaintiffs herein to establish the Southern District of New York as a permissible venue for this suit. The government relied by analogy on *Liberation News Service v. Eastland*, 426 F.2d 1379, 1384 (2d Cir. 1970), a suit against 10 United States Senators and the Senate Committee's Chief Counsel, none residents of New York. The Court of Appeals concluded that Congress intended Section 1391(e) to apply only to the executive branch. The Court stated:

> [T]he officers and employees of the United States who were made reachable by § 1391(e) were the same types of officers or employees who could be compelled to perform a duty to the plaintiff under § 1361. (*Id.* at 1384).

The government argued that this holding that Section 1391(e) is inapplicable to congressional officials applies also to officials of the judiciary as was held by the Fifth Circuit in *Duplantier v. United States*, 606 F.2d 654, 661 (5th Cir. 1979). In that case a suit was dismissed for lack of personal jurisdiction as to the Judicial Ethics Committee of the Judicial Conference, Judge Edward Allen Tamm, the committee chairman and clerks of all United States courts, on the ground that Section 1391(e) is inapplicable to such judicial personnel who were performing a "judicial administrative function".

The response of the plaintiffs to the holding in *Duplantier* was two-fold. They called attention to the fact that the Fifth Circuit nonetheless permitted the suit to be continued against the United States and the Attorney General for a ruling on the merits. Plaintiffs said that a ruling rejecting personal jurisdiction under § 1391(e) "would

likely be fatal to plaintiffs' lawsuit because plaintiffs' limited resources make pursuit of the action in Washington unlikely."

The second point made by plaintiffs on the issue of personal jurisdiction was that the role of the Director and his office is purely administrative and non–judicial.

It cannot fairly be urged that we are not dealing with an arm of the judiciary. The office of which Mr. Foley is the Director is the "Administrative Office of the United States Courts"; it was so constituted and entitled by the Congress, 28 U.S.C. §§ 601, 604. The interpreters who are to be certified by the Director are to be used "in courts of the United States". 28 U.S.C. § 1827(a). The interpreters certified are not divorced from direct involvement in the disposition by the courts of their judicial business. Clearly the Director is called upon to perform a judicial administrative function in certifying interpreters for the disposition of judicial business by the federal courts, in the same sense of judicial administration that the designee of the Judicial Conference of the United States, Judge Tamm, performed his function in developing reporting forms and promulgating necessary regulations and receiving the financial reports of members of the federal judiciary, pursuant to the Ethics in Government Act of 1978, 28 U.S.C.App. I, § 301 *et seq.*

The objection of the government of lack of personal jurisdiction of the Director was, during the trial, withdrawn and waived but solely for the purposes of this suit and without prejudice in any other matter.

### The Propriety of the Certification Procedure

Plaintiffs' challenge to the Court interpreters certification procedure falls into three areas:

(1) they attack the decision to screen out candidates based on the first part of the test, the written proficiency test;

---

**2.** Plaintiffs' claims of jurisdiction under the Tucker Act, 28 U.S.C. § 1346(a)(1)(2) (Supp. 1980) are misplaced; that statute does not authorize claims for anything other than money damages. Likewise, their claims to jurisdiction under the Administrative Procedure Act, 5

U.S.C. § 701 *et seq.*, and the Mandamus and Venue Act of 1962, 28 U.S.C. § 1361 will not serve to authorize this suit. Those statutes apply to matters arising in the executive branch and its administrative agencies.

(2) they attack the written examination itself as designed to test archaic and esoteric matters that do not confront bilingual interpreters in federal court proceedings; and

(3) they assert that certain individuals improperly received preferred treatment and status.

### The Statute Involved

Passed in 1978, the Act sought to systematize the selection and appointment of Court Interpreters and directed the Administrative Office to devise a certification procedure;

(a) The Director of the Administrative Office of the United States Courts shall establish a program to facilitate the use of interpreters in courts of the United States.

(b) The Director shall prescribe, determine, and certify the qualifications of persons who may serve as certified interpreters in courts of the United States in bilingual proceedings and proceedings involving the hearing impaired (whether or not also speech impaired), and in so doing, the Director shall consider the education, training, and experience of those persons. The Director shall maintain a current master list of all interpreters certified by the Director and shall report annually on the frequency of requests for, and the use and effectiveness of, interpreters. The Director shall prescribe a schedule of fees for services rendered by interpreters.

28 U.S.C. § 1827.

The procedure which the Director followed in prescribing, determining and certifying the qualifications of persons who may serve as certified interpreters in courts of the United States in bilingual proceedings was substantially the following.

Mr. Jon Leeth, the Chief of the Court Interpreters Unit of the Director's office, undertook a broad scale study of the problem of interpreting needs of the federal courts. The purpose was to identify the manner in which interpreting was being conducted, the capabilities in use, the needs of the federal courts in this regard and how to qualify persons to fill those needs.

Mr. Leeth visited with about 80 persons including: Chief Judges of federal courts; the leaders, presidents and vice presidents of the major interpreting associations in the United States; people in the professional interpreting departments at the Department of State, United Nations; and directors of interpreting programs of various universities around the country. He interviewed State of California officials who were developing tests for interpreters and met with representatives of the City of Los Angeles to see what kind of tests they had.

A point that emerged from these interviews was that there was a mistaken belief abroad that if one was bilingual he or she could interpret; but that just does not follow.

The other thing discovered was that judges insisted that the people to be certified should be able to render what is said in the court as it was said, not to short–circuit what was being said or to change the level of the language that was being used; that it was not the role of the interpreter to simplify the language of the courtroom to a level *believed by the interpreter* to represent the level of a witness' understanding.

He found as he did job audits and interviewed interpreters that in fact many interpreters believed that they should short–circuit the judicial proceedings; that it is their job to make certain that the individual for whom they are interpreting understands what is being said and that if the lawyers and Judges use elaborate vocabulary, they were to reduce it to very simple terms so that a peasant, for example, could understand. Another thing he found on his job audits was that many interpreters simply do not have the command of the language, either Spanish or English, to know what is being said in the courtroom. Not knowing English they couldn't get it across in Spanish. He sat in one magistrate's courtroom in Texas where the interpreter completely

changed the motive of the accused although she had no idea that she was changing his motive; but she didn't know what he said.

Mr. Leeth also found that interpreters were asked to do a very difficult job and were not remunerated for the kind of effort and skills and abilities that they had to have. Mr. Leeth recommended to the Director that he approve an upgrading of interpreting jobs from Grades JSP 5, 6 and 7 to JSP 10, 11 and 12 which while it didn't quite double the salary it did increase it considerably and put employed interpreters on the same level as the State Department and international interpreting.

In the course of the study, six outstanding professional people were identified and enlisted to help the Director set up a proper test for language proficiency and oral interpreting skill, namely:

1. Dr. Roseann Gonzalez a professor of English at the University of Arizona who had done a PhD dissertation on the level of language used in courtrooms. She made an extensive examination of transcripts of court proceedings and had analyzed them in a major study of the language used in the courtroom.

2. Dr. Maria Theresa Astiz, a professor of Spanish at the State University of New York, who is also a former interpreter for the United States Department of State and who has done intensive study of court interpreting throughout the United States at the local, state and federal levels.

3. Etilvia Arjona, who is a graduate of the Geneva School of Interpreting, an ex–director of the Monterey Institute's Department of Interpreting and Translation which is the only school in the United States that gives a Master's Degree in interpreting and translation; she is now a PhD student at Stanford University in Education and Testing.

4. Ellie Weinstein, the President of the California Court Interpreters Association, who for 15 years has been a practicing court interpreter in the Superior Court System in Los Angeles.

5. Alvaro Galvan, who is the head Spanish/English interpreter at the Organization of American States.

6. Dr. Eugene Briere, a professor of Linguistics at the University of Southern California and a specialist in setting up these kinds of tests; he has done a major analysis of the Miranda Rights language.

This team was brought to Washington for a two week conference at which it was decided that a test was needed. The test would have to indicate a good vocabulary, wide range for criminal and civil cases; actual interpreting skills; and an ability to interpret with precision and in such a manner that the style and the tone of the language that was being used in the court could be conserved without changing the meaning of what was going on. Test words were taken out of actual trial transcripts. Vocabulary lists that the California Court Interpreters Association had prepared for their members to study from in anticipation of the State of California test were studied and selections made therefrom.

A whole series of cases had been brought to the conference together with reference material, text books, language guides and word frequency books to determine the level of difficulty of the words that were taken out of the transcripts so that the conferees could match and make equally difficult words on the test. Dr. Gonzalez' study had shown that it was necessary to have a minimum of 14 years of education (equivalent to 2 years of college) to understand what goes on in a criminal trial and they all believed that it was necessary to have more than that to understand what goes on in a civil trial.[3]

---

3. The language level in the courts is high due to the fact that lawyers, expert witnesses and judges represent groups of professionals who have had at least 15 to 20 years of formal classroom education. This calls for interpreters with an essential comprehension at the college level of language proficiency and precision in each language.

After the group had finished developing a proposed test three judges came to review it with them: Judge Rinaldo Garza of Texas, Judge Juan Perez Gimenez of Puerto Rico, and Judge Jose Gonzalez of Fort Lauderdale. They were shown what had been done and why it had been done and the judges were asked whether the conferees were on track and going where the judges wanted them to go and they all replied "yes". One of the judges commented that "this is good and if interpreters don't pass this test they should not be in my courtroom".

All of the consultants who are specialists in test development said that a pilot test would have to be run for the result produced. The group wanted to pilot test it around the country so that they would have people who had different backgrounds in Spanish taking the test. Accordingly, they went to the southwest, to Texas, to Los Angeles, to Chicago, came to New York and went to Miami to have people take the pilot test.

Twenty–four people participated in the pilot test. They were requested to answer every question and make any comments they wanted about each item and furnish their global assessment of the test. The test was open–ended without a time limit on it because for statistical analysis the group wanted to be sure they answered the questions and wanted their comments on every question.

The results of the test were then shipped to the University of Southern California where Professor Briere ran them through a computer for a statistical analysis to see how the pilot test had come out. For validity and reliability purposes the statistics were very good and better than one would expect on a first run of a test of this kind. The test had an English section and a Spanish section each of which had five parts to it: antonyms, synonyms, a sentence completion section, a reading comprehension section, and a language usage section to test those things that the experts said were needed to gauge language proficiency.

As a result of the analysis of the pilot test responses, the questions were revised and improved. Thereafter the whole group of people mentioned above met in Brownsville, Texas to work on the oral portion of the test and there were added to the group. Theodore Fagen, Chief Interpreter of the United Nations, and Dr. David Gerver, who was from the University of Stirling in Scotland; he had done major work identifying interpreter aptitudes.

It was thought that for practicality of testing on the oral examination that it would be done in a simulated courtroom format. Trial transcripts were obtained from the archives in Brownsville and sections were taken out that would determine whether a person could handle the frozen language that occurs in court, the formal language, the slang, and the colloquialisms. A charge to the jury and an opening statement by defense counsel were utilized.

Dr. Astiz and Mrs. Arjona and Judges Gonzalez and Perez Gimenez wrote the direct testimony, the direct examination and cross–examination questions that would be in a courtroom format. Simulated probation reports were prepared and used. Dr. Carlos Astiz wrote a power of attorney and these were used as testing instruments to see if the person in fact had skills in interpreting in addition to having the vocabulary needed.

One of the interesting things that was done in the oral tests was to develop a way for the first time in interpreter testing to objectify a scoring system for interpreters. Every other test that had been heard of for interpreters was just a subjective reaction of a panel to how the person did, but this group wanted an objective portion and that was put in. A subjective part was also put in. This covered: how adaptable is the person to the language used; how well does the interpreter deliver the material that the interpreter is hearing; what is the level of fluency and pronunciation: it was all graded pass–fail.

Each candidate was reviewed by a panel of three people; an active court interpreter as a peer rater; a specialist in the Spanish language; and an international conference interpreter for interpreting techniques.

The names of these raters were obtained through the State Department, the test development team and others who were helpful.

A group of 15 test raters was assembled and they were trained for three days in how to apply the oral test so that everybody would be tested exactly the same way throughout the United States.

The written and oral tests were then administered to the candidates for certification and the people who passed the tests were recommended to the Director for certification.

Some on the certification list took neither the oral test nor the written test nor the pilot written test. But those were people who helped develop those tests, had been professional interpreters with the Department of State, or graduated the Geneva School of Interpreting, or were professionals with the United Nations or the Organization of American States. Each of those who was certified had qualifications at least equivalent and probably superior to the level of certification.

It will be useful to detail here also, some of the testimony of Professor Roseann Duenas Gonzalez, another member of the team of experts engaged to develop the examination for certification status.

Dr. Gonzalez is a professor of linguistics and teaches applied linguistics at the University of Arizona where she is the Director of the Graduate Program. Her doctoral dissertation was on the subject of the courtroom register of English, a work that she was commissioned to do beginning in 1975 by the Superior Court in Tucson, Arizona. Her project was to come up with an instrument that would test the English language proficiency of a defendant in the justice system and also to find the appropriate time when to test a defendant's knowledge of English so that an interpreter could be called at the right times so that he would have total due process. Dr. Gonzalez found that the language of the law was not common everyday English and that it was something unto itself.[4]

This idea of the language of the law is an old idea. Courtroom language is something unto itself; English is not the official language of the court and this is what she began studying; what exactly are the parameters of courtroom English. Her study is the first to have looked at it in a very objective way.

She looked at transcripts of records from the Superior Court in the criminal field and covered a group of more than 10,000 words which she looked at for vocabulary, the difficulty of the vocabulary, its complexity, its breadth, and the precision of the kind of vocabulary that was used in the courtroom area. She looked at courtroom language from the point of view of readability which is a study of the complexity of the concepts of the language that takes into consideration the syntax, the structure and the complexity of the vocabulary. She also looked at courtroom language according to what kind of structure was used, the verbs, the circumlocutions, the indirect use of language and other idiosyncracies.

Her conclusion was that it was appropriate to talk of courtroom language as a separate register of English, a separate brand of English which had its own characteristics, its own set of vocabulary which repeated through many, many transcripts. It has an overall difficulty level, according to her readability study, of the fourteenth grade which means that a person has to have competence of understanding language, an intellectual understanding of the fourteenth grade level which is a sophomore in college level.

Dr. Gonzalez used a readability formula called the Yoakam formula, to measure the complexity of language of textbooks so that when she measured the complexity of the language in the courtroom sample that she studied it came across the board as fourteenth grade.

She emphasized that the important thing to remember is that we are not just talking about the ability to comprehend the language at a minimal level but to comprehend it to the point where the interpreter would

---

4. Dr. Gonzalez had found that words used in simple hearings never appeared or appeared three times or less in a normal million words of print.

be able to give a meaningful, accurate equivalent of that language, conserving the language level, style and tone.

Dr. Gonzalez emphatically rejected the notion that an interpreter's role is to simplify the fourteenth–grade language used in the courtroom so that a defendant who does not have a fourteenth–grade education can understand it.

Describing the Washington conference of the experts she testified that they came to the distillation of what is the function of an interpreter, how best to test it, a decision to have a two–part examination and each part was to have equal importance. The first part had to be a written examination because they had to get at the basic command that a person has of both languages and that was where her work really came into play. In the choosing of the vocabulary, the reading passages were geared to the fourteenth grade level. She has worked continually on college board examinations and educational testing service and the level mentioned is not considered to be a very rigorous examination of language. It is basic command of language, vocabulary and reading. The reading passages are in the test because there is a very high correlation between the ability to extract information from a reading passage and the proficiency of one's language. So when the antonym and synonym and sentence completion sections were chosen the group constantly had in mind this readability level.

The experts selected 23 out of 48 English words from her list compiled from courtroom records.

Those who were involved in the preparation of the test had made up enough tests so that the content validity and the face validity of the test prepared vindicated their expertise and established it to be a good test of what it was wanted to measure.

When the three judges mentioned previously spoke to the group they emphasized that the interpreter had to have precision in language and in order to have this a person had to have a wide range of vocabulary and had to have the subtleties and the nuances of the language really down pat.

The pass–fail score was determined computationally at the point where the minimal competency should be drawn. That happened to be lower than what the group of experts intuitively felt should be the cut–off point but they went along with the lower figure. It was a computational analysis based on standard deviation.

Dr. Gonzalez called attention to one of the greatest misperceptions that there is in this whole field. That is that if a person is bilingual it is believed that that person is able to interpret. She gave examples of experiences in Arizona and New Mexico where janitors were called into the court to interpret; where secretaries of judges or clerks of libraries were called in to interpret; and that, she explained, was the problem with the justice system and why it was necessary to have this certification process. Dr. Gonzalez pointed out that language competency is not a static monolithic entity. Language competency is a developing area, a knowledge that unless it is developed can stagnate, or can stay at the same level. And so when a person has daily expanded his or her language ability, learned more precise vocabulary, learned more nuances and subtleties of language, then, this kind of training and learning and experience and education is reflected most definitely on a proficiency test of their language command and their language.

Counsel for plaintiffs viewed the Court's function in this case to be the determination of the Director's reasonableness, not necessarily agreeing with every choice of question–his reasonableness in setting up the certification examination. It was testified by Dr. Gonzalez, that the experts employed here were of outstanding quality who had the expertise and who had the experience in writing these tests, people who were Geneva School graduates. "You just don't find people like that. I think there is one to a continent. You don't find people like that very often." To make the best test possible the Director had used the best possible input available; "they were the six best in the country," she said.

The other experts called by the government corroborated the opinions and advice

given by Dr. Gonzalez and the procedures used by Mr. Leeth. They testified that the language used in the test that had been formulated was neither arcane, esoteric or archaic as charged by the plaintiffs.

It was further established that the test used for certification was evaluated before the test was given by a psychometrician who was entirely outside of the group of experts. Psychometrics is metrics from mathematical measurement; it is the psychology of measurement. The procedures in setting up the test were thus reviewed and found to be of the highest quality.

■ The Court finds on the totality of the evidence that the tests given by the Director were in all respects reasonable and not beyond his statutory powers, not an abuse of his discretion and represented a constitutional exercise of those powers to achieve the use of interpreting personnel in the courts of the United States having language proficiency and oral interpreting skill.

The Court has heretofore filed basic findings hereon which are hereby supplemented and the foregoing shall constitute further findings pursuant to Rule 52(a) Federal Rules of Civil Procedure. (A copy of the findings previously filed is annexed hereto as an Appendix).

SO ORDERED.

## APPENDIX

### FINDINGS

Made at the Close of the Trial
December 2, 1980

THE COURT: I find and decide as follows on the substance of the claims herein, leaving it to a later supplement and opinion to be filed to deal with other matters presented, namely:

1. The examinations and the parts thereof in the content and manner in which they were given for certification of interpreters for the United States courts were fairly, reasonably and comprehensively developed and prepared under outstanding expert guidance, and properly, fairly and reasonably administered.

2. The said tests and/or the criteria used by the Director bore a rational and proper relation to skills appropriate, necessary and required for requisite precision interpretation by bilingual interpreters in courtroom settings and were valid and reliable in purpose and effect.

3. The written portions of the examination administered, tested candidates on language proficiency, rationally related to matter normally encountered in a courtroom by bilingual interpreters, and presented proper, reasonable, and valid criteria, and necessarily and in fact took into consideration the education, training and experience of courtroom interpreters, and of the applicants for certification as such under the statute being considered.

4. The objections to the written portion of examinations that have been asserted have not been shown to relate to the precision of the bilingual performance of interpreters heretofore used in the United States courts and elsewhere.

5. The forensic qualities and prior extended use in court of interpreters are not to be equated with the performance of precise interpretations of the meaning and level of the matter and of the individual being translated.

6. There was no improper or preferential treatment of any persons or improper selection of or undue advantages afforded to any candidate who was certified or tested under the statute for interpretative work, and the methods of rating of performance on the tests were fair, reasonable, and appropriate, and rationally related to the object thereof.

7. The certification program and the examinations therefor, devised and used, satisfied the express and implied terms and intent of the Court Interpreters Act of 1978, 28 U.S.C., Section 1827, et seq., and of the consideration to be given thereunder to the education, training and experience of persons seeking to qualify for the statutory certification.

8. The tests to which applicants for certification were subjected were neither arbitrary nor capricious in any aspect thereof.

9. The Court finds the evidence of the government's witnesses to be credible and unimpeached.

The foregoing shall constitute the findings of fact required by Rule 52(a) on the substance of the claims herein, which will later be supplemented by findings on peripheral matters, and judgment thereon shall be entered pursuant to Rule 58, Federal Rules of Civil Procedure.

In view of the foregoing, the motion for a preliminary injunction is in all respects denied, and since only a narrow issue is here presented which would not involve the matters on which the plaintiffs' counsel has indicated he has not had the opportunity to address himself, there seems to be no further reason for the maintenance of this suit.

The complaint will accordingly be dismissed, without costs.

It is so ordered December 2, 1980.